**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

Case No. _____

| | |
|---|---|
| SCULLY ROYALTY LTD.,<br><br>    Plaintiff,<br>  v.<br><br>IAT REINSURANCE CO. LTD., PETER KELLOGG, CHARLES KELLOGG, MILFAM LLC, NEIL SUBIN, SKYLER WICHERS, ALAN HOWE & MARK HOLLIDAY,<br><br>    Defendants. | **JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATIONS OF SECTION 13(D)**

**PRELIMINARY STATEMENT**

1.          This case arises under Section 13(d) of the Securities Exchange Act (the "Exchange Act") of 1934, 15 U.S.C. §§ 78m(d) *et seq.*  The Defendants, IAT Reinsurance Co. Ltd. ("IAT"), Peter Kellogg ("Kellogg"), Charles Kellogg, Milfam LLC ("Milfam"), Neil Subin, Skyler Wichers, Alan Howe, and Mark Holliday, constitute a group of activist investors.  Activist investors raid public companies in an effort to take full or partial control of their boards of directors for their own self-serving purposes, at the expense of other shareholders.  That is exactly what Defendants attempted here.  Their target was Scully Royalty Ltd. ("Scully" or the "Company").  In late 2025, on information and belief, Defendants worked in coordination to consolidate a majority of Scully's voting power and launch a proxy contest for control of Scully's Board of Directors (the "Board").  But Defendants failed to disclose their coordination to investors.

2.          Section 13 of the Exchange Act targets collaboration where investors work as a "group" to achieve some particular objective with respect to a public company.  Section 13(d) requires any person that beneficially owns 5% or more of a company's stock to publicly disclose its position by filing a Schedule 13D.  Relevant here, Section 13(d) requires any group formed for the purpose of acquiring, holding, or voting the stock of a company to disclose the group's existence if the group members collectively beneficially own 5% or more of an issuer's stock.  Such persons and groups must file Schedule 13D to disclose this information to investors and must promptly amend Schedule 13D to disclose material changes, including agreements regarding board control.

3.      Section 13(d) is designed to ensure transparency.  It ensures that other shareholders of a company know when a "group" of investors has decided to work together, so that the shareholders who are not part of the group can decide how to best vote their own shares, or whether they should form a "group" of their own in response. The statute does not bar activist investors like Defendants from forming groups or from working with other investors to achieve their aims.  But it does prohibit doing so while keeping other investors in the dark.  The key is full disclosure.

4.      Scully's stock trades on the New York Stock Exchange.  Scully owns a royalty interest in an iron mine in Canada, leveraging those royalties to create value for its shareholders.

5.      Scully brings this action against Defendants for violating Section 13(d). Scully seeks injunctive and declaratory relief and corrective disclosures arising from Defendants' undisclosed cooperative effort to disenfranchise Scully's shareholders and wrest control of Scully from its duly elected Board and senior management.

6.      Scully's most recently filed annual report identified Kellogg and Milfam (as manager, general partner or investment advisor of entities formerly managed by the late Lloyd Miller, III) as the only persons known to Scully to beneficially own more than 5% of the Company's shares.

7.      Defendant Kellogg has an extensive history with Scully, having previously waged a 2013 proxy contest at the Company and serving as Board Chair from 2014 until his resignation in 2015.

8. Defendant Kellogg's most recent Schedule 13D disclosure of his ownership of Scully stock is dated July 25, 2022 – over three years before Defendants' takeover attempt – and reported that Kellogg beneficially owned shares that constitute approximately 35% of Scully's current voting power.

9. Defendant Kellogg also has a history of violating Section 13(d).  In 2014, the Securities and Exchange Commission ("SEC") ordered Kellogg to cease and desist from committing or causing any violations and any future violations of Section 13(d) and to pay a penalty of $100,000 because he failed to timely file required disclosures with respect to his ownership of stock in Scully's predecessor and other companies.

10. Defendant Milfam has filed a recent series of Schedule 13D disclosures of its ownership of Scully stock, which reported beneficial ownership of shares constituting approximately 13% of Scully's current voting power.

11. Defendant Milfam is a long-time activist at Scully and no stranger to attempts at effectuating board removals at the Company.  On December 11, 2023, Milfam announced an activist investment position in Scully in the lead up to the Company's 2023 annual meeting, nominating four directors in a control contest that was ultimately unsuccessful.

12. Milfam initiated another control contest for Scully after Scully's November 2025 announcement that its annual meeting would occur at its office in Hong Kong on December 27, 2025 (the "2025 Annual Meeting").

13. Milfam's control contest moved rapidly.  On November 25, 2025, Milfam sent the Company its nomination notice with its slate of directors (the "Nomination

4

Notice"). Milfam filed a series of Schedule 13D amendment filings on November 26, 2025, December 8, 2025, December 19, 2025, and December 29, 2025. Neither the Nomination Notice, nor these Schedule 13D amendment filings, disclosed the existence of the group or its attempted control of Scully's Board as required by Section 13(d).

14. On December 8, 2025, Milfam circulated deficient proxy materials seeking votes from other shareholders in support of the Milfam slate (the "2025 Proxy Contest"). Proxy materials are public disclosures in which companies (or activist investors) disclose information about their board candidates in advance of a shareholder vote.

15. Scully examined Milfam's Nomination Notice and proxy materials, determining that they omitted key information about Milfam and its candidates and also that the Nomination Notice was untimely and did not comply with the procedures set out in Scully's Amended and Restated Memorandum and Articles of Association dated July 12, 2017 (the "Articles"). Scully issued a Form 6-K on December 15, 2025, and two Forms 6-K on December 22, 2025, alerting shareholders to these material deficiencies.

16. Scully also advised Milfam of the Nomination Notice's deficiencies. In response, Milfam filed a lawsuit in the Grand Court of the Cayman Islands on December 10, 2025, seeking to declare its Nomination Notice timely (the "First Cayman Proceeding"). The Cayman Islands court found that the Nomination Notice was timely, and on December 23, 2025, Scully promptly filed a notice of appeal of the First Cayman Proceeding.

17.     On December 24, 2025, Scully's board of directors postponed the 2025 Annual Meeting to allow a hearing before the Cayman Islands Court of Appeals.

18.     Nevertheless, Milfam and the Defendants attempted to hold a purported shareholder meeting (the "purported 2025 Annual Meeting") in the hallway outside the Company's Hong Kong office on December 27, 2025.

19.     On December 29, 2025, Milfam filed a Schedule 13D and issued a press release from Stuart, Florida, claiming that a purported Annual Meeting had occurred and that Milfam's slate had been elected to Scully's board of directors.

20.     In what appeared to be an attempt to further entrench their supposed control of Scully, Milfam filed another lawsuit in the Grand Court of the Cayman Islands on January 5, 2026, seeking declarations that Scully's postponement of the 2025 Annual Meeting was invalid, that the purported 2025 Annual Meeting supposedly held by Milfam on December 27, 2025 was valid, and that the "election" of Milfam's slate of board nominees was also valid (the "Second Cayman Proceeding").

21.     Before obtaining any clarity or a ruling in the Second Cayman Proceeding, Milfam and their affiliates—including individual Defendants Subin, Howe, Holliday, and Wichers—improperly attempted to act in place of Scully's lawful management and Board.  For approximately six months, Milfam and these individual defendants acted as if they lawfully controlled Scully.  They purported to have replaced Scully's Board members and to have terminated Scully's CEO for cause.  They also issued press releases purportedly made on behalf of the Company.  And they made decisions negatively impacting the Company's contracts and business relationships.

22.     On January 14, 2026, Wichers signed and caused to be filed with the SEC a Form 6-K, supposedly on behalf of Scully.  This filing attached a press release issued from Stuart, Florida, by Milfam, which asserted that "the recently elected board of directors of Scully" had terminated for cause Scully's CEO, Samuel Morrow.  The press release quoted Wichers as stating that approximately 59% of the outstanding shares of Scully had voted at the purported 2025 Annual Meeting – this despite the fact that Milfam had disclosed that it beneficially owned only about 13% of Scully's shares.

23.     On January 15, 2026, Wichers signed and caused to be filed with the SEC another Form 6-K, supposedly on behalf of Scully.  This filing claimed that the purported 2025 Annual Meeting had occurred and that at least 20% of the Company's shares were present in person or by proxy – again despite the fact that Milfam had disclosed that it beneficially owned only about 13% of Scully's shares.

24.     On March 18, 2026, Howe caused a Form 3 to be filed with the SEC asserting that he was a "Director" of Scully.  On March 26, 2026, Jerrod Freund, another Milfam nominee, caused a Form 3 to be filed with the SEC also asserting that he was a "Director" of Scully.

25.     On July 2, 2026, the Grand Court of the Cayman Islands issued its judgment in the Second Cayman Proceeding (the "Judgment").  The court found that the purported 2025 Annual Meeting was invalid.  The Cayman court also held that (1) Milfam did not have the authority under Scully's Articles to appoint a chairperson for the purported 2025 Annual Meeting when no existing directors were present; and (2) that even if Milfam's appointment of a meeting chair at the 2025 Annual Meeting was valid,

Milfam's November 25, 2025 nomination notice and December 8, 2025 proxy statement failed to disclose relevant and material matters concerning Defendants Howe and Holliday's relationship with Milfam, rendering the resolutions appointing them to the Scully Board invalid.  And although Scully's appeal in the First Cayman Proceeding remains pending, the outcome of that appeal is now likely academic in light of the Judgment.  The Judgment confirmed the Milfam directors never had authority to operate on the Company's behalf, and that the existing Scully Board continues to maintain control over Scully's corporate affairs.

26. On July 8, 2026, the Company issued a Form 6-K attaching as an exhibit the Company's July 7, 2026 press release that announced the Judgement and clarified that Scully's Board of Directors and management remained unchanged and that Milfam and its nominees never had authority to act on behalf of the Company.  The press release also informed shareholders that SEC filings made since January 1, 2026, purportedly on behalf of the Company, were unauthorized, misleading and inaccurate and should be disregarded in their entirety, and that the Form 3 reports filed by Howe and Freud were improper and incorrectly filed.

27. On July 8, 2026, both Freund and Howe filed amendments to their March Form 3 filings, confirming that they are not, and never were, directors of Scully.

28. From the November 2025 beginning of the proxy contest to the present, none of the Defendants disclosed that they were working as a group, or that their combined voting power was more than 50%.  All that Defendants needed to do was to make their coordination public by filing a simple disclosure on Schedule 13D.  No

Defendant did that.  Instead, Milfam proposed a slate of directors to take over the Scully Board, purporting to act alone, all the while working behind the scenes with the other Defendants in an effort to seize and effectuate their control of Scully.  Investors still lack basic information about the group's composition, agreements, and which shareholders supposedly approved Milfam's slate at the purported 2025 Annual Meeting.

29.     This conduct violates Section 13(d) and warrants injunctive and declaratory relief and corrective disclosures.

## THE PARTIES

30.     Plaintiff Scully Royalty Ltd. is a foreign private issuer traded on the New York Stock Exchange as "SRL."  The Company owns a 7% royalty interest in the Scully mine, an iron mine located in Canada.  The Company's royalty interest has provided predictable, multi-million-dollar revenues to the Company and dividends to its shareholders for the last fifty years.  The royalty generates an estimated annual revenue of $35 million and expires in 2055.  Michael J. Smith serves as Scully's Executive Chairman, and Samuel S. Morrow serves as Scully's Chief Executive Officer.

31.     Defendant IAT Reinsurance Co. Ltd. ("IAT") is a Cayman Islands exempted company headquartered at Building 4, 2nd Floor, 23 Lime Tree Bay Avenue, Governors Square, Cayman Islands and is registered to receive mail in the United States at 48 Wall Street, New York, New York 10005.  IAT purports to do business throughout the United States; its website lists more than fifty "agent partners" in the states of Florida and New York alone.  IAT is listed as a related party to Peter Kellogg in Kellogg's July 25, 2022, Schedule 13D filing.

32.     Defendant Peter Kellogg is a billionaire and former President and Chief Executive Officer of IAT.  Since resigning from management, Kellogg continues to exercise oversight of IAT in his role as Chairman. As of July 25, 2022, when Kellogg filed his most recent Schedule 13D amendment, which identified his wife and IAT as related parties, he reported beneficial ownership of 5,293,276 shares of the Company, or approximately 35% of the Company's current voting power.

33.     Defendant Charles Kellogg is Peter Kellogg's son.   Charles Kellogg has controlled IAT since approximately 2020 or 2021.

34.     Defendant Milfam LLC is a Delaware limited liability company headquartered at 2336 SE Ocean Boulevard, Suite 400, Stuart, Florida.  Milfam is a single-family office managing the collective assets of the descendants of Lloyd I. Miller, Jr, and the beneficial owner of 1,985,952 shares of the Company, or approximately 13% of the Company's current voting power.

35.     Defendant Neil Subin is the President, Chief Investment Officer, and Manager of Milfam LLC.  Subin signed Milfam's Schedule 13D filings across the relevant time period and resides in Stuart, Florida.

36.     Defendant Skyler Wichers has served as an executive and portfolio manager of Milfam since 2019.  Wichers was a Milfam nominee to the Company's Board.

37.     Defendant Alan Howe serves on Milfam's Management Oversight Committee.  Howe was a Milfam nominee to the Company's Board.

10

38.     Defendant Mark Holliday was a Milfam nominee to the Company's Board.

## JURISDICTION AND VENUE

39.     This is a civil action arising under Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), and the rules and regulations promulgated thereunder.

40.     This Court has subject-matter jurisdiction over this action pursuant to federal question jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa.

41.     This Court has personal jurisdiction over IAT because it regularly and systematically conducts business in the state of Florida.

42.     This Court has personal jurisdiction over Peter Kellogg and Charles Kellogg based upon their oversight and control of IAT.

43.     This Court has personal jurisdiction over Milfam because it is headquartered in Florida, and because it took actions including issues press releases from Stuart, Florida, in connection with the attempt to effectuate a change in control of Scully.

44.     This Court has personal jurisdiction over Subin because he is President of Defendant Milfam and because he is a Florida resident.

45.     The Court has personal jurisdiction over Wichers because he is the portfolio manager of Milfam and because he was a Milfam nominee to the Scully Board.

46.     This Court has personal jurisdiction over Howe because he serves on Milfam's Management Oversight Committee and because he was a Milfam nominee to the Scully Board.

47.     This Court has personal jurisdiction over Holliday because he was a Milfam nominee to the Scully Board

48.     This Court also has personal jurisdiction over each and all of the Defendants because, on information and belief, each participated in communications to effectuate a change of control in Scully and/or formed a group for that purpose, culminating in the press release that Milfam issued from Stuart, Florida, which was filed with the SEC purportedly on behalf of Scully.

49.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 and Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa, because Defendants are subject to personal jurisdiction in the state of Florida and the claims in this action arise from acts or transactions that occurred within the Southern District of Florida.  Among other things, Defendant Milfam's misleading 13D filings were transmitted from its Florida headquarters, signed by Florida resident Subin, and the address provided on each relevant Milfam Schedule 13D filing is located within this District.

## FACTUAL BACKGROUND

### A.     Scully Royalty Creates Value for Shareholders

50.     Scully is a foreign private issuer (a non-governmental, non-U.S.-based entity that is not primarily owned by U.S. stockholders) whose stock trades on the New

York Stock Exchange as "SRL."  Scully owns a 7% royalty interest that expires in 2055 in an iron mine in Canada, which generated annual revenue of approximately $35 million.  Scully leverages those royalties to create value for its shareholders.

51.     The Company's royalty interest has provided predictable, multi-million-dollar annual revenue to the Company for the last fifty years.  The mine produces an estimated three million metric tons of iron ore per year, and the mine sits on iron ore deposits approximating 700 million tons.  The mine's ore contains 65% iron, which commands a premium on the global markets.  The mine also relies on hydroelectric energy, reducing the carbon emissions associated with its operations and generating iron ore for shipment that is more environmentally friendly and desirable than other options on the market.

52.     The Company, through its Board and officers, have guided Scully to strategic prioritization of its mining royalty interest and have streamlined a diverse asset portfolio.  Despite the fact that the Scully mine was out of operation from 2014 until August 2019, the Company's management team successfully reoriented Scully's assets, yielding significant cash dividends to shareholders regularly since 2021.

53.     Like other publicly traded companies, Scully holds an annual meeting of shareholders.  Consistent with its prior practice, in November 2025, Scully announced that it planned to hold its 2025 Annual Meeting at the Company's office in Hong Kong on December 27, 2025.

**B.      Defendants Fail to File Accurate Schedule 13D Disclosures**

54.      Section 13 of the Exchange Act targets collaboration where investors work as a "group" to achieve some particular objective with respect to a public company. Section 13(d) requires any person that beneficially owns 5% or more of a company's stock to publicly disclose its position by filing a Schedule 13D.  Relevant here, Section 13(d) requires any group formed for the purpose of acquiring, holding, or voting the stock of a company to disclose the group's existence if the group members collectively beneficially own 5% or more of an issuer's stock.  Such persons and groups must file Schedule 13D to disclose this information to investors and must promptly amend Schedule 13D to disclose material changes, including agreements regarding board control.

55.      In the Company's Annual Report filed on Form 20-F on April 30, 2025, Scully identified Kellogg and Milfam (as manager, general partner or investment advisor of entities formerly managed by the late Lloyd Miller, III) as the only persons known to hold beneficially own more than 5% of the Company's shares, holding 35.7% and 13.6%, respectively.  The Company's later Form 6-K filing, dated December 5, 2025, disclosed similar information regarding its major shareholders.

56.      Defendant Kellogg has an extensive history with Scully, having previously waged a 2013 proxy contest at the Company and serving as Board Chair from 2014 until his resignation in 2015.

57.      Defendant Kellogg's most recent Schedule 13D disclosure of his ownership of Scully stock is dated July 25, 2022 – over three years before Defendants'

14

takeover attempt – and reported that Kellogg beneficially owned shares that constitute approximately 35% of Scully's current voting power.

58.     Defendant Kellogg also has a history of violating Section 13(d).  In 2014, the Securities and Exchange Commission ("SEC"), ordered Kellogg to cease and desist from committing or causing any violations and any future violations of Section 13(d) and to pay a penalty of $100,000 because he failed to timely file required disclosures with respect to his ownership of stock in Scully's predecessor and other companies.

59.     Defendant Milfam has filed a recent series of Schedule 13D disclosures of its ownership of Scully stock, which reported beneficial ownership of shares constituting approximately 13% of Scully's current voting power.  Milfam filed a series of Schedule 13D amendment filings on November 26, 2025, December 8, 2025, December 19, 2025, and December 29, 2025.  Neither the Nomination Notice, nor these Schedule 13D amendment filings, disclosed the existence of the group or agreements regarding the control of Scully's Board as required by Section 13(d).

60.     Milfam's Schedule 13D, filed November 26, 2025, announced its control contest and disclosed a proposed slate of directors as well as Milfam's intention to solicit proxies from other shareholders to vote in favor of the Milfam proposed directors.  That same filing also announced that: "The Reporting Persons have also engaged in preliminary discussions with other shareholders of the Issuer regarding its proposal to remove the existing members of Board and to elect the Nominees to the Board."  Milfam repeated this statement verbatim in both of its subsequent Schedule 13D filings on December 8, 2026—without ever disclosing to the public who those "other shareholders"

were, or the nature of their "preliminary discussions" regarding the proposal to remove existing Board members.

### C. Milfam Launches a Control Contest for Scully Pursuant to Misleading and Incomplete Proxy Materials

61.     On November 26, 2025, shortly after Scully announced the 2025 Annual Meeting, Milfam announced that it was launching a control contest for Scully.  Milfam nominated a slate of directors for election to unseat and replace the current Scully Board and announced its intent to solicit other Scully stockholders to support its nominees for election at the upcoming 2025 Annual Meeting.  Milfam's November 26, 2025, December 8, 2025, December 19, 2025, and December 29, 2025, SEC filings regarding the control contest were signed by Defendant Subin on behalf of Milfam.

62.     Specifically, on December 8, 2025, Milfam circulated proxy materials proposing a slate of five director candidates – Jerrod Freund, Mark Holliday, Alan Howe, Nimesh Patel, and Skyler Wichers (the "Milfam Nominees") – for election at the Company's 2025 Annual Meeting.  At the time of the proxy filing, Milfam beneficially owned approximately 13% of Scully's voting power.

63.     Milfam's proxy materials contained a number of inaccuracies and material omissions that obscured the relationships between Milfam and the Milfam Nominees. For example:

>    a.  Milfam proxy materials did not disclose to investors Milfam nominee Alan Howe was a member of Milfam's Management Oversight Committee, was a director and officer of other Milfam-owned and/or controlled entities and received compensation from Milfam in

connection with these positions.  As part of the Management Oversight Committee, Howe has the responsibility of determining Defendant Subin's compensation, whether he is removed or retained as President, approving transactions where Subin may be conflicted and exerting an important supervisory role over the affairs of Milfam. The proxy also failed to disclose that Milfam owns over 90% of Anacomp Inc., an entity where Howe has been a director since 2007 and now serves as Chairman.

b.  Milfam's proxy materials did not disclose to investors that Milfam nominee Mark Holliday also has an extensive history with Milfam. Holliday has served on boards of companies in which Milfam was the largest shareholder, including Alimco Re Limited, where Defendant Howe also serves on the board along with Defendant Wichers. Holliday has also maintained significant and longstanding professional and fiduciary relationships with Defendant Subin, Milfam's President, having acted as a trustee for Subin.

c.  Milfam's proxy materials did not disclose to investors that Milfam nominee Wichers had actively worked with Subin since the age of 15.

64.    These omissions were material to Scully shareholders because, by concealing these relationships, Scully shareholders could not assess the level of control Milfam might be able to exercise over the Milfam Nominees if they were elected in the 2025 Proxy Contest.  The Judgment in the Second Cayman Proceeding has since

17

confirmed that Milfam's proxy materials were materially misleading and incomplete with respect to Howe and Holliday.

65.     Scully evaluated Milfam's proxy materials and nomination notice and concluded that the nomination did not comply with the requirements of Scully's corporate charter.  Specifically, the nomination notice failed to meet the required timelines prescribed by the advance notice provisions found at Article 20.2(a) which required the nomination notice be provided "not later than the close of business on the tenth (10th) day following the notice date."  Scully accordingly advised Milfam on December 5 and publicly informed shareholders on December 12, 2025, that Milfam's nomination notice was invalid.

**D.     Milfam Files Litigation Against Scully and Attempts to Hold a Purported Annual Meeting**

66.     On December 10, 2025, Milfam filed a lawsuit initiating the First Cayman Proceeding in the Grand Court of the Cayman Islands, seeking a declaratory judgment that its director nomination complied with the Company's advance notice requirements. The court entered oral judgment in Milfam's favor on December 19, 2025, and issued a written judgment on December 23, 2025.  Scully appealed to the Cayman Islands Court of Appeal the same day the written judgment was entered.  That appeal remains pending.

67.     Given the ongoing legal proceedings and the material deficiencies in the Milfam proxy, on December 24, 2025, Scully's Board postponed the 2025 Annual Meeting to allow time for the Court to rule and to ensure shareholders were allowed a fully informed and fair election.  Scully promptly announced the postponement in a press release to its shareholders on the same day.  Scully had also issued two Forms 6-K on

18

December 22, 2025, alerting shareholders to material deficiencies in the Milfam proxy, including Howe's and Holliday's undisclosed entanglements with Milfam.

68.     Rather than await the appellate court's ruling or respect the decision of the duly elected Scully Board, Milfam immediately announced on December 26, 2025, that it would convene an unauthorized shareholder meeting.  Milfam did not articulate any reason why it had to hold the shareholder meeting so quickly.  Given that there was no rush to hold the election prior to the resolution of the First Cayman Proceeding, it can be inferred that Milfam's actions were designed to wrestle control of the Company away from the Board at a time when Scully's other shareholders would be caught unaware.  Just one day later, and with next to no notice to Scully's shareholders, on December 27, 2025, Milfam and its associates held a purported, fly-by-night shareholder meeting in the hallway outside the Company's Hong Kong office.  The purported 2025 Annual Meeting was attended by only two junior Milfam employees and several of their outside counsel from multiple law firms.  Milfam claimed that one of the junior Milfam employees chaired the meeting and, by proxy, voted a majority for Milfam's slate.

69.     On December 29, 2025, Scully filed a Form 6-K confirming that no valid meeting had occurred and that the purported vote was invalid.  The Company explained that the 2025 Annual Meeting had not yet occurred but had been postponed, that the Board remained in place, and that the Company had "informed MILFAM of the invalidity of its unilateral actions" during the postponement   The Company further urged the shareholders only to rely on official communications from the Company, and later became aware that Milfam had been attempting to communicate with shareholders using

19

an "SRL-Board@outlook.com" email address.  On information and belief, that email was created by Milfam and was not sanctioned by anyone at Scully.

70.     Seeking to further consolidate its position, Milfam filed the Second Cayman Proceeding in the Grand Court of the Cayman Islands on January 5, 2026, this time seeking a declaration that (i) Scully's December 24 postponement of the 2025 Annual Meeting was invalid; (ii) that the purported 2025 Annual Meeting held on December 27 was valid; and (iii) that Milfam's director slate had been elected to the Scully Board.  Milfam also asked for an order requiring Scully to name its nominees to the Scully Board.

**E.     Scully Later Learns That Milfam, Kellogg, and their Affiliates Formed an Undisclosed Group for the Control Contest**

71.     Unbeknownst to Plaintiff at the time, Milfam had not orchestrated this control contest on its own.  Later events revealed that, on information and belief, Milfam formed an undisclosed group with Kellogg and the other Defendants to facilitate its attempt to improperly seize control of Scully.

72.     Peter Kellogg is a beneficial owner of approximately 35% of Scully's shares, along with his son, Charles Kellogg, and their affiliated entity, IAT.  Kellogg is the former CEO of IAT and currently serves as its Chairman.

73.     Non-party David Pirrung is the Chief Financial Officer of IAT Insurance Group Inc., a corporation headquartered in North Carolina that is a wholly-owned subsidiary of IAT Reinsurance Company Ltd.  Pirrung reports directly to Peter Kellogg and Charles Kellogg.  On information and belief, Pirrung attended multiple meetings with

Milfam and the Milfam Nominees on behalf of Kellogg in connection with the 2025 control contest for Scully.

74. Around the time of and after the purported 2025 Annual Meeting, Scully Executive Chairman Michael Smith and Scully CEO Samuel Morrow had discussions with Kellogg and Pirrung, regarding purported shareholder concerns. Taken together, those interactions strongly suggest that Kellogg was coordinating with Milfam to support its contest for control of Scully.

75. Before the initially scheduled 2025 Annual Meeting, Scully's CEO, Morrow, reached out to Kellogg to get his input and feedback regarding shareholder concerns. During that telephone conversation, which took place on December 16, 2025, Kellogg advised Morrow that Milfam's CEO, Subin, had discussions with certain of Kellogg's "guys" in Raleigh regarding shareholder concerns. On information and belief, Pirrung was one of the "guys."

76. A few weeks later, on January 19, 2026, during a telephone conversation between Pirrung and Morrow to discuss a potential Board compromise, Pirrung confirmed that he spoke with representatives of Milfam "once or twice." Pirrung also confirmed that – after the telephone call – he would speak to both Kellogg and Milfam nominee Wichers about Morrow's proposed Board compromise, strongly suggesting that Kellogg and Milfam (though its executive and board nominee, Wichers) were coordinating on both the Board election and the post-purported 2025 Annual Meeting governance of the Company. There would be no reason for one of Kellogg's "guys" to

21

be involved in any discussions about Scully's Board composition with Milfam if Kellogg was not collaborating with Milfam and the Milfam Nominees.

77.     Even further suggestive of Kellogg's intent, Kellogg wrote in a January 27, 2026, email to Morrow regarding the purported 2025 Annual Meeting: "The hand writing is on the wall – Time to adjust – Dave can speak for us Best."  On information and belief, Kellogg was referring to Dave Pirrung, Chief Financial Officer of IAT Insurance Co.

78.     On information and belief, during 2026, Peter Kellogg, Pirrung and Wichers communicated about the proxy contest and how the Milfam Nominees could effectuate their control over Scully.

79.     Neither these individuals, nor any of the Defendants, disclosed their mutual objective of effectuating a change of control at Scully to shareholders as required under Section 13(d).  Once two persons enter into even an "understanding" to effectuate a change of control in a publicly traded company, they must file a Schedule 13D indicating as much to public shareholders.

80.     Milfam and its affiliates caused to be filed two Forms 6-K, dated January 14 and January 15, 2026, purportedly made on behalf of Scully by Wichers, claiming to have fired the Company's chief executive officer and to have validly elected a new slate of directors—and signed by Wichers who held himself out to public shareholders as "Chairman of the Board" of Scully and through his representatives pressured the Company's EDGAR filing firm, Toppan Merrill, to file the Forms 6-K without the existing Board's approval.  Further, two SEC Forms 3 were filed by Milfam Nominees

Howe and Jerrod Freund on March 18 and March 26, 2026, where each identified themselves as newly-elected directors of Scully.  Freund and Howe's Form 3 filings, purportedly identifying themselves as directors of the Company following the purported 2025 Annual Meeting, are illustrative of their ongoing ties to Milfam, which they later both withdrew on July 8, 2026 in Form 3 Amendments, citing to the Judgment and disclosing that at no point did they have the requisite legal authority to act as directors of the Company.

81.      On information and belief, Wichers and Milfam filed the aforementioned Forms 6-K on behalf of Scully through improperly pressuring the Company's third-party filing firm, Toppan Miller, to file the flawed January 14 and January 15, 2026, Forms 6-K.  The Company contracts with Toppan Miller to finalize and publish the Company's SEC filings as part of its regular course of business.

82.      On July 8, 2026, Scully filed a Form 6-K that explained to shareholders that its Board and management remained unchanged and that the SEC filings Milfam and its principals had directed under the Company's name on January 14, 2026, and January 15, 2026, were incorrect and filed without authorization.  In its accompanying press release, the Company informed shareholders that, as a result of the Milfam group's conduct, the Company was unable to meet required filing deadlines, leading to an order by the NYSE that suspended trade of the Company's common shares on May 12, 2026. The Company also informed shareholders that its independent auditor had resigned.

83.      Wichers and Subin are employees and managers of Milfam.  They have served alongside Howe and Holliday on boards of Milfam-controlled companies for

years.  And they selected Howe and Holliday as nominees to the Scully Board in order to continue expanding Milfam's influence and control over publicly traded companies, in a move that the Second Cayman Proceeding held left public shareholders in the dark.

**F.       Kellogg's Prior Section 13(d) Violations**

84.       The SEC has previously found that Kellogg violated Section 13(d) in connection with Scully's predecessor and other companies.

85.       Kellogg's beneficial ownership of shares in Scully and its predecessor entities dates back to at least 1999.  Between November 2013 and December 2013, Kellogg initiated a contentious proxy contest (the "2013 Proxy Contest") with the Scully Board in which he sought to expand the Scully Board to eleven seats and nominate eight individuals to serve on the Scully Board, including himself.

86.       In response to the Kellogg-initiated proxy contest, MFC Industrial Ltd. ("MFC")—Scully's previous name—initiated a Section 13(d) lawsuit on November 25, 2013 in the Southern District of New York against Peter Kellogg, Charles Kellogg, IAT, and other members and affiliates of the Kellogg family for failing to disclose Kellogg's intention to seek control of MFC.

87.       Rather than filing a responsive pleading, on February 7, 2014, Kellogg entered into a mutual settlement agreement with MFC to resolve the case.  In return for MFC voluntarily dismissing the pending litigation with prejudice, Kellogg, IAT, and their affiliates agreed, *inter alia*, to not "form or join in a partnership, limited partnership, syndicate or other group, including, without limitation, a group as such term is used in Section 13(d) of the Exchange Act" with unrelated third parties absent MFC Board

24

approval that was binding until 2016.  The settlement agreement also permitted Kellogg to maintain the seat he received on the Scully Board during the 2013 Proxy Contest.

88.     Less than a year later, on September 10, 2014, the SEC announced charges against a number of corporate insiders for reported failures to timely file ownership and insider reports pursuant to Sections 13 and 16 of the Exchange Act, including Kellogg and four other individuals with "especially high rates of filing deficiencies."  In connection with this enforcement initiative, the SEC instituted a cease-and-desist proceeding against Kellogg pursuant to SEC Administrative Proceeding File No. 3-16073.  Kellogg was found to have violated reporting requirements with respect to holdings in four publicly-traded companies, including Scully.

89.     Specifically, the SEC charged Kellogg with failure to timely file initial or required amendments to Schedule 13D and failure to timely file multiple reports of transactions.  With respect to his holdings in the Company (formerly known as MFC Industries Ltd.), this included a failure to file multiple required Schedule 13D amendments during a period of more than twelve years from October 2000 to January 2013.  As a result, Kellogg was ordered to (i) cease and desist from committing or causing any violations and future violations of Sections 13(d) and 16(a) of the Exchange Act and Rules 13d-1, 13d-2, and 16a-3 promulgated thereunder, and (ii) pay a civil money penalty to the SEC in the amount of $100,000.

90.     Kellogg's 13(d) violations did not stop there.  Even after being fined by the SEC, Kellogg did not update his Schedule 13D – which was filed on February 10, 2014 – until July 25, 2022.  That leaves an *eight-year gap* during which Kellogg made no

amendments or updates to his Schedule 13D.  However, during that time, multiple events happened which should have triggered amended Schedule 13D filings.

91.     Pursuant to Rule 13d-2(a), amendments to Schedule 13D are required to report any material change to the information set forth in a previously filed Schedule 13D, including acquisitions or dispositions that constitute one percent or more of the outstanding common shares (the "1% Threshold").  Kellogg's February 10, 2014 Form 13D/A reported beneficial ownership of 20,662,400 Scully shares, or 33% of the Company's outstanding stock.  A few years later, on July 13, 2017, the Company made an approximately 5:1 reverse stock split (the "Stock Split").  Based on the Stock Split, Kellogg would have beneficially held approximately 4,132,480 Scully shares on a split-adjusted basis as of February 2014.  On Kellogg's July 2022 13D/A, he reported beneficial ownership of 5,293,276 Scully shares.  This means Kellogg acquired at least 1,160,796 additional Scully shares on a split-adjusted basis between the February 2014 13D/A and the July 2022 13D/A – far exceeding the 1% threshold.

92.     Further, Kellogg reports holding shared dispositive and voting power over shares held by IAT.  IAT reported beneficial ownership of 13,405,000 Scully shares on the February 2014 13D/A.  However, a review of the Form 13F filings made by IAT reveals significant fluctuations in beneficial ownership that likely triggered multiple amendment filings between the February 2014 13D/A and the July 2022 13D/A.  In particular:

> a.  IAT's Form 13F filed on February 3, 2016, for the quarter ended December 31, 2015, reported that IAT held only 793,869 Scully

shares, reflecting a potentially dramatic decrease in Scully shares beneficially held as compared to the 13,405,000 Scully shares reported in the February 2014 13D/A.

b. On November 14, 2016, IAT filed a Form 13F, for the quarter ended September 30, 2016, which reported 13,662,400 Scully shares held by IAT, reflecting a potentially dramatic increase from the prior quarter.

c. On May 14, 2019, IAT filed a Form 13F for the quarter ended March 31, 2019, which reported 2,444,422 Scully shares held.

d. On November 15, 2019, IAT filed a Form 13F for the quarter ended September 30, 2019, which reported 2,732,477 Scully shares held.

e. On August 13, 2021, IAT filed a Form 13F for the quarter ended June 30, 2021, which reported 2,978,399 Scully shares held.

f. On February 11, 2022, IAT filed a Form 13F for the quarter ended December 31, 2021, which reported 3,216,668 Scully shares held.

93. Kellogg and IAT's failure to make timely and complete 13D/A filings make it impossible for Scully shareholders to ascertain the amount Kellogg, IAT, and/or Kellogg's wife currently hold, and what material changes to those amounts occurred during the eight-year period.

94. According to recent filings with the SEC, Kellogg continues to hold shared voting and dispositive power over all stock held by IAT.  However, public records in North Carolina and Nebraska indicate that the ultimate ownership of IAT was transferred in or around February 2021 to Charles Kellogg.  Charles Kellogg has never

reported beneficial ownership of Scully shares, nor any other securities held by IAT. Assuming Charles Kellogg does, in fact, control voting or investment power over securities held by IAT, Charles and Kellogg have violated Section 13(d) by failing to disclose that Charles Kellogg is acting as part of the Kellogg and IAT group. Furthermore, Kellogg's most recent beneficial ownership filings with the SEC – filed on April 10, 2023 and December 9, 2025 – continue to report that Kellogg holds shared voting and dispositive power over IAT shares, making it impossible for Scully shareholders to determine who controls what portion of the Company's outstanding stock – precisely what Section 13(d) was designed to prevent.

95.     Not only do Kellogg's SEC filings fail to report accurate, up-to-date information about his beneficial ownership and any groups or coordination efforts he is a part of, his Form 13D/As also fail to make other required disclosures.

96.     For example, Item 2(e) of Schedule 13D requires disclosure, during the last five years, of any "civil proceeding of a judicial or administrative body of competent jurisdiction" that resulted in "a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws." The SEC Order falls squarely within this disclosure requirement, as it ordered Kellogg to cease and desist from future violations of beneficial ownership reporting requirements. Kellogg should have amended his Schedule 13D promptly to disclose the SEC Order.

97.     In another example, Kellogg's 13D/A failed to disclose that Kellogg was appointed to – and then promptly stepped down from – Scully's Board. Indeed, Item 4(d)

28

of Schedule 13D requires amendment where there is "any change in the present board of directors or management of the issuer."  On March 22, 2014, Kellogg was appointed Chairman of the Scully Board.  In that role, Kellogg assumed a position of greater leadership and gained a heightened degree of control and influence over the Company. On July 20, 2015, Kellogg stepped down from the Scully Board entirely, which materially changed his level of influence and control over the Company.  These updates should have been reported.

98.     Kellogg's July 2022 13D/A also contains a number of significant technical deficiencies, which render the filing confusing and materially deficient.  For instance, Item 3 of Schedule 13D requires disclosure of the "amount of funds or other consideration used or to be used in making" purchases described in the filing, and "[w]here material, such information should also be provided with respect to prior acquisitions not previously reported pursuant to this regulation."  This information was not provided for the Scully shares reported as purchased in Item 5(c), nor for the substantial acquisition of Scully Shares that occurred since the February 2014 13D/A.

99.     Further, Instruction C to Schedule 13D requires that if a reporting person is a corporation, disclosures under Items 2 through 6 of Schedule 13D must be provided for "(a) each executive officer and director of such corporation; (b) each person controlling such corporation; and (c) each executive officer and director of any corporation or other person ultimately in control of such corporation."  The executive officers and directors of IAT, other than Kellogg himself, were never disclosed on any Schedule 13D filing.

29

100.     Finally, Kellogg's 13D violations are not limited to those associated with his and his affiliates' holdings in the Company.  For example, a review of the Form 13F filings made by IAT against Kellogg's Schedule 13D filings with respect to his beneficial ownership of common stock of Mercer International Inc. ("Mercer"), par value $1.00 per share, reveals further unexplained material changes that likely triggered additional amendment filings.  In particular:

    a.   IAT's Form 13F filed on February 13, 2015, for the quarter ended December 31, 2014, reported that IAT held 15,606,223 Mercer Shares, reflecting a potential material decrease as compared to 16,224,508 Mercer Shares reported in Kellogg's latest Schedule 13D amendment, filed on February 11, 2013 (the "February 2013 Mercer 13D/A").

    b.   On February 3, 2016, IAT filed a Form 13F for the quarter ended December 31, 2015, reporting that IAT held 628,030 Mercer Shares, reflecting a potentially dramatic decrease in Mercer Shares from the prior quarter.

    c.   On November 14, 2016, IAT filed a Form 13F for the quarter ended September 30, 2016, reporting that IAT held 16,456,223 Mercer Shares, reflecting a potentially dramatic increase in Mercer Shares from the prior quarter.

    d.   Following the February 2013 Mercer 13D/A, which included IAT as a reporting person, Kellogg did not file an amendment to his statement on Schedule 13D with respect to Mercer Shares for a twelve-year

period, until Kellogg filed a Schedule 13D/A on July 23, 2025 reporting that Kellogg held a beneficial ownership interest in 23,455,000 Mercer Shares. IAT is confoundingly no longer listed as a reporting person, despite Kellogg continuing to report indirect ownership of Mercer Shares held by IAT on his Form 4 Statements of Change of Beneficial Ownership with respect to Mercer Shares.

e. Based on a review of the public filings, it appears that IAT remains the parent and controlling entity of each of the entities with respect to which IAT Form 13F filings are made. This includes Commercial Alliance Insurance Company, SafePort Insurance Company and International Fidelity Insurance Company ("Additional IAT Entities"). However, any indirect holding of beneficial ownership with respect to such Additional IAT Entities is notably absent from any Form 4 filings by Kellogg at Mercer. Furthermore, IAT's Form 13F filed November 10, 2025, reflects an increase in Mercer Shares from the prior quarter, however, no additional Form 4 filing by Kellogg occurs with respect to his Mercer Shares until December 9, 2025.

101. Similar potential violations were apparent in Kellogg's beneficial ownership reporting with respect to common shares of Nam Tai Property Inc. ("Nam Tai"), par value $0.01 per share.  For example, IAT's first Form 13F filed on February 13, 2015, reported that IAT held 5,774,800 Nam Tai Shares. This indicates a meaningful change in Kellogg's ownership since his last Schedule 13D/A filed more than ten years

earlier on January 21, 2004, reporting that Kellogg held 1,157,600 Nam Tai Shares. Furthermore, despite other material fluctuations in IAT's holdings of Nam Tai Shares reported on IAT's Form 13F filings between 2015 and 2016, Kellogg did not file another Schedule 13D amendment for a more than sixteen-year period, between the January 2004 13D/A and Kellogg's Schedule 13/A filed on September 11, 2020.

### G.    The Cayman Court Rules in Scully's Favor

102.    On July 2, 2026, the Cayman Court in the Second Cayman Proceeding returned a judgment finding that the purported 2025 Annual Meeting was invalid. Specifically, the Court found that Section 18.1 of Scully's Articles did not grant shareholders the power to appoint a meeting chairman, as Milfam had attempted. Accordingly, the court found that no business could validly be conducted at the purported 2025 Annual Meeting, meaning the Milfam Nominees were not validly elected.

103.    The Court also found that, consistent with Scully's December 22, 2025 Form 6-K notice to its shareholders, Milfam's November 25, 2025, nomination notice and proxy statement contained inadequate disclosures with respect to Defendants Howe and Holliday.  Therefore, even if the procedures outlined in Scully's Articles had been followed, the Court determined that Howe and Holliday's elections were nevertheless invalid.  For this reason, even if the First Cayman Proceeding is resolved in Milfam's favor, and the court finds the purported 2025 Annual Meeting was valid, the Second Cayman Proceeding's Judgment means that no valid business could have been, or was, conducted at that meeting regardless, up to and including the so-called election of the Milfam Nominees to the Scully Board.

32

104.     Following the Judgment in favor of the incumbent Board, Defendant Howe filed an amended Form 3 on July 8, 2026, characterizing his prior March 18, 2026, filing—which identified Howe as a purported member of the Scully Board—as being "in error."  Howe stated:  "The Reporting Person is not a director of the Issuer", and that in light of Judgment issued by "the Grand Court of the Cayman Islands", "there was a failure to appoint any directors, including the Reporting Person, and the incumbent directors remain in office until either their successors are elected or they otherwise cease to hold office."  Freund filed a substantially identical amendment on the same day.

105.     On July 8, 2026, the Company issued a Form 6-K, explaining to shareholders that the Company's Board and management remained unchanged and that the SEC filings Milfam and its principals had directed under the Company's name were incorrect and filed without authorization.  The accompanying press release also informed shareholders that, as a result of the Milfam group's conduct, the Company was unable to meet required filing deadlines, leading to an order by the NYSE that suspended trade of the Company's common shares on May 12, 2026.  In addition, the Company's independent auditor resigned.

## CLAIM FOR RELIEF

**Violation of Section 13(d) of the Exchange Act (15 U.S.C. § 78m(d)) and Regulation 13D-G (17 C.F.R. § 240.13d-1, 17 C.F.R. § 240.13d-5, 17 C.F.R. § 240.13d-101) – Schedule 13D Filings**
**(Against All Defendants)**

106.     Plaintiff repeats and realleges the above allegations in Paragraphs 1 to 105 as if fully set forth herein.

107.     Section 13(d) of the Exchange Act requires that investors acting as a group for the purpose of acquiring, holding, or voting the stock of an issuer must disclose the group's existence and make plain their intentions once group members collectively acquire the beneficial ownership of 5% percent or more of the issuer's stock.  15 U.S.C. § 78m.

108.     Rule 13d-1(a) provides that any person who acquires the beneficial ownership of 5% percent or more of the issuer's stock must file with the SEC within ten days after the acquisition a statement containing the information required by Schedule 13D.  17 C.F.R. § 240.13d-1.

109.     Rule 13d-5(b) provides that when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of the issuer's stock, the group shall be deemed to have acquired beneficial ownership for purposes of Section 13(d) of the Exchange Act.  17 C.F.R. § 240.13d-5.

110.     Here, Defendants formed a "group" for purposes of Rule 13(d).  As explained above, there is evidence that representatives of Kellogg and Milfam met, discussed, and coordinated regarding the vote on Scully's Board of directors before the vote occurred, and then continued to act together, as a group, regarding the governance of Scully after the vote.

111.     As set forth above, Milfam's and Kellogg's Schedule 13D and amendments thereto fail to make the full and fair disclosure required by the Exchange Act and the rules promulgated thereunder, including, but not limited to, by failing to

disclose that Milfam, Kellogg, and the remaining Defendants had agreed to act together for purposes of voting the Company's stock in connection with the 2025 Proxy Contest.

112.    In the alternative, even if Defendants Milfam and Kellogg did not form a "group" within the meaning Section 13(d), by reason of the foregoing each was required to file updated and accurate Schedule 13D disclosures.  Failing to do so operates as a separate and independent violation of Section 13(d).

113.    By reason of the foregoing, Defendants violated Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, including Rules 13d-1, 13d-5, and 13d-101.

114.    Because of the material omissions in Milfam's and Kellogg's Schedules 13D and all amendments thereto, Scully and its shareholders are threatened with irreparable harm, including a repeat contest with the same group at the forthcoming 2026 Annual Meeting.  There is no adequate remedy at law for such irreparable harm. Therefore, injunctive relief is appropriate to ensure the Defendants' misconduct is corrected.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

a.    Declaring that Defendants have violated Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, including Rule 13d-1, 13d-5 and 13d-101;

b.    Issuing an injunction ordering Defendants to furnish accurate disclosures under Section 13(d) of the Exchange Act as required by

35

law on Schedule 13D before Defendants can vote their shares at the Company's next shareholder meeting as scheduled and duly convened by the Company's validly elected Board of Directors;

c.  Awarding Plaintiff its costs and fees in this action, including its reasonable fees for effectuating compliance with Section 13(d) of the Exchange Act; and

d.  Granting Plaintiff such other relief as this Court may deem just and proper.

Dated: July 15, 2026

Respectfully submitted,

*/s/ Martin B. Goldberg*
Martin B. Goldberg
Florida Bar No. 827029
mgoldberg@lashgoldberg.com
Benjamin R. Shiekman
Florida Bar No. 113114
bshiekman@lashgoldberg.com
LASH GOLDBERG FINEBERG LLP
Miami Tower
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131-2158
Telephone: (305) 347-4040
Facsimile: (305) 347-4050

LATHAM & WATKINS LLP
Colleen C. Smith (*pro hac vice forthcoming*)
12670 High Bluff Drive
San Diego, CA 92130-3086
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
Colleen.Smith@lw.com

John J. Barber (*pro hac vice forthcoming*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Jack.Barber@lw.com

Jordan Davisson Cook (*pro hac vice forthcoming*)
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626-1925
Telephone: (714) 755-8238
Facsimile: (714) 755-8290
Jordan.Cook@lw.com

*Attorneys for Plaintiff Scully Royalty Ltd.*

37