**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

Case No. 2:26-cv-14257-AMC

SCULLY ROYALTY LTD.,

Plaintiff,

v.

IAT REINSURANCE CO. LTD., IAT INSURANCE GROUP, INC., PETER KELLOGG, CHARLES KELLOGG, GOOSE CREEK CAPITAL, INC., HARCO NATIONAL INSURANCE COMPANY, MILFAM LLC, NEIL SUBIN, SKYLER WICHERS, ALAN HOWE & MARK HOLLIDAY,

Defendants.

**JURY TRIAL DEMANDED**

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF SECTION 13(D), TORTIOUS INTERFERENCE, AND CIVIL CONSPIRACY**

## PRELIMINARY STATEMENT

1. This case arises under Section 13(d) of the Securities Exchange Act (the "Exchange Act") of 1934, 15 U.S.C. §§ 78m(d) *et seq.*, as well as Florida common law. The Defendants, IAT Reinsurance Co. Ltd., IAT Insurance Group, Inc., Peter Kellogg ("Kellogg"), Charles Kellogg, Goose Creek Capital, Inc., Harco National Insurance Company, Milfam LLC ("Milfam"), Neil Subin, Skyler Wichers, Alan Howe, and Mark Holliday, constitute a group of activist investors. Activist investors raid public companies in an effort to take full or partial control of their boards of directors for their own self-serving purposes, at the expense of other shareholders. That is exactly what Defendants attempted here. Their target was Scully Royalty Ltd. ("Scully" or the "Company"). In late 2025, on information and belief, Defendants worked in coordination to consolidate a majority of Scully's voting power and launch a proxy contest for control of Scully's Board of Directors (the "Board" or "Board of Directors"). But Defendants failed to disclose their coordination to investors.

2. Section 13 of the Exchange Act targets collaboration where investors work as a "group" to achieve some particular objective with respect to a public company. Section 13(d) requires any person that beneficially owns 5% or more of a company's stock to publicly disclose its position by filing a Schedule 13D. Relevant here, Section 13(d) requires any group formed for the purpose of acquiring, holding, or voting the stock of a company to disclose the group's existence if the group members collectively beneficially own 5% or more of an issuer's stock. Such persons and groups must file Schedule 13D to disclose this information to investors and must amend Schedule 13D

within two business days to disclose material changes, including agreements regarding board control.

3. Section 13(d) is designed to ensure transparency. It ensures that other shareholders of a company know when a "group" of investors has decided to work together, so that the shareholders who are not part of the group can decide how to best vote their own shares, or whether they should form a "group" of their own in response. The statute does not bar activist investors like Defendants from forming groups or from working with other investors to achieve their aims. But it does prohibit doing so while keeping other investors in the dark. The key is full disclosure.

4. Scully's stock trades on the New York Stock Exchange. Scully owns a royalty interest in an iron mine in Canada, leveraging that interest to create value for its shareholders.

5. Scully brings this action against Defendants for violating Section 13(d). Scully seeks injunctive and declaratory relief and corrective disclosures arising from Defendants' undisclosed cooperative effort to disenfranchise Scully's shareholders and wrest control of Scully from its duly elected Board and senior management.

6. Scully's most recently filed annual report identified Kellogg and Milfam (as manager, general partner or investment advisor of entities formerly managed by the late Lloyd Miller, III) as the only persons known to Scully to beneficially own more than 5% of the Company's shares.

7. Defendant Kellogg has an extensive history with Scully, having previously waged a 2013 proxy contest at the Company and serving as Board Chair from 2014 until his resignation in 2015.

8. Defendant Kellogg's most recent Schedule 13D disclosure of his ownership of Scully stock reported that Kellogg and his affiliated entities beneficially owned shares that constitute approximately 35% of Scully's current voting power.

9. Defendant Kellogg also has a history of violating Section 13(d). In 2014, the Securities and Exchange Commission ("SEC") ordered Kellogg to cease and desist from committing or causing any violations and any future violations of Section 13(d) and to pay a penalty of $100,000 because he failed to timely file required disclosures with respect to his ownership of stock in Scully's predecessor and other companies.

10. Defendant Milfam has filed a recent series of Schedule 13D disclosures of its ownership of Scully stock, which reported beneficial ownership of shares constituting approximately 13% of Scully's current voting power. Together, Milfam and Kellogg (and their affiliated entities) own approximately 48.5% of Scully's voting power.

11. Defendant Milfam is a long-time activist at Scully and no stranger to attempts at effectuating board removals at the Company. On December 11, 2023, Milfam announced an activist investment position in Scully in the lead up to the Company's 2023 annual meeting, seeking to nominate four directors in a control contest that was ultimately unsuccessful.

12. Milfam initiated another control contest for Scully after Scully's November 2025 announcement that its annual meeting would occur at its office in Hong Kong on December 27, 2025 (the "2025 Annual Meeting").

13. Milfam's control contest moved rapidly. On November 25, 2025, Milfam sent the Company its nomination notice with its slate of directors (the "Nomination Notice"). Milfam filed a series of Schedule 13D amendment filings on November 26, 2025, December 8, 2025, December 19, 2025, and December 29, 2025. Neither the Nomination Notice, nor these Schedule 13D amendment filings, disclosed the existence of the group or its attempted control of Scully's Board as required by Section 13(d).

14. On December 8, 2025, Milfam circulated deficient and misleading proxy materials seeking votes from other shareholders in support of the Milfam slate (the "2025 Proxy Contest"). Proxy materials are public disclosures in which companies (or activist investors) disclose information about their board candidates in advance of a shareholder vote.

15. Scully examined Milfam's Nomination Notice and proxy materials, determining that they omitted key information about Milfam and its candidates and also that the Nomination Notice was untimely and did not comply with the procedures set out in Scully's Amended and Restated Memorandum and Articles of Association dated July 12, 2017 (the "Articles"). Scully issued a Form 6-K on December 15, 2025, and two Forms 6-K on December 22, 2025, alerting shareholders to these material deficiencies.

16. Scully also advised Milfam of the Nomination Notice's deficiencies. In response, Milfam filed a lawsuit in the Grand Court of the Cayman Islands on December

10, 2025, seeking to declare its Nomination Notice timely (the "First Cayman Proceeding"). The Cayman Islands court found that the Nomination Notice was timely, and on December 23, 2025, Scully promptly filed a notice of appeal of the First Cayman Proceeding.

17. On December 24, 2025, Scully's Board of Directors announced its resolution for the postponement of the 2025 Annual Meeting to allow a hearing before the Cayman Islands Court of Appeals.

18. Nevertheless, Milfam announced they would proceed with the 2025 Annual Meeting on December 26, 2025, and did so in the hallway outside the Company's Hong Kong office a day later on December 27, 2025. At that meeting, both Milfam and Kellogg (via proxy) voted their shares in favor of Milfam's slate of directors.

19. On December 29, 2025, Milfam filed a Schedule 13D and issued a press release from Stuart, Florida, claiming that the 2025 Annual Meeting had occurred and that Milfam's slate had been elected to Scully's Board of Directors.

20. In what appeared to be an attempt to further entrench their supposed control of Scully, Milfam filed another lawsuit in the Grand Court of the Cayman Islands on January 5, 2026, seeking declarations that Scully's postponement of the 2025 Annual Meeting was invalid, that the purported 2025 Annual Meeting supposedly held by Milfam on December 27, 2025 was valid, and that the "election" of Milfam's slate of board nominees was also valid (the "Second Cayman Proceeding").

21. Before obtaining any clarity or a ruling in the Second Cayman Proceeding, Milfam and their affiliates—including individual Defendants Subin, Howe, Holliday, and

Wichers—improperly attempted to act in place of Scully's lawful management and Board. For approximately six months, Milfam and these individual defendants acted as if they lawfully controlled Scully. They purported to have replaced Scully's Board members and to have terminated Scully's CEO for cause. They also issued press releases purportedly made on behalf of the Company. And they made decisions negatively impacting the Company's contracts and business relationships.

22. On information and belief, Wichers, Subin, Howe, and Holliday knew, or were in reckless disregard of the truth, that the Milfam Nominees were not recognized as directors in the Company's register of directors.

23. On information and belief, Howe and Holliday knew, or were in reckless disregard of the truth, that the entity that sought to nominate them—Milfam—had also initiated the Second Cayman Proceedings that sought, among other things, declaratory relief that the Milfam Nominees constituted the Board of Scully. Howe and Holliday served as Milfam Nominees alongside Wichers, who served concurrently both as a manager at Milfam and a Milfam Nominee to the Scully Board, and who held himself out as "Chairman" of the purported "new board." Howe, Holliday, and Wichers coordinated their attempts to complete various corporate acts on behalf of Scully, including their decision to purportedly terminate Scully's CEO for cause.

24. On January 14, 2026, Wichers signed and caused to be filed with the SEC a Form 6-K, supposedly on behalf of Scully. This filing furnished a press release issued from Stuart, Florida, by Milfam, which asserted that "the recently elected board of directors of Scully" had terminated for cause Scully's CEO, Samuel Morrow. The press

release quoted Wichers as stating that approximately 59% of the outstanding shares of Scully had voted at the 2025 Annual Meeting—this despite the fact that Milfam had disclosed that it beneficially owned only about 13% of Scully's shares.

25. On January 15, 2026, Wichers signed and caused to be filed with the SEC another Form 6-K, supposedly on behalf of Scully. This filing claimed that the 2025 Annual Meeting had occurred and that at least 20% of the Company's shares were present in person or by proxy—again despite the fact that Milfam had disclosed that it beneficially owned only about 13% of Scully's shares—and claimed that individual Defendants Howe, Holliday, and Wichers had been appointed at the 2025 Annual Meeting as directors of Scully and appointed to committees of the Scully board of directors a day later on December 28, 2025.

26. On March 18, 2026, Howe caused a Form 3 to be filed with the SEC asserting that he was a "Director" of Scully. On March 26, 2026, Jerrod Freund, another Milfam nominee, caused a Form 3 to be filed with the SEC, also asserting that he was a "Director" of Scully.

27. On July 2, 2026, the Grand Court of the Cayman Islands issued its judgment in the Second Cayman Proceeding (the "Judgment"). The court found that the resolutions passed at the 2025 Annual Meeting were invalid. Specifically, the Cayman court held that (1) Milfam did not have the authority under Scully's Articles to appoint a chairperson for the 2025 Annual Meeting when no existing directors were present, such that no business could validly be conducted at the 2025 Annual Meeting; and (2) that even if Milfam's appointment of a meeting chair at the 2025 Annual Meeting was valid,

Milfam's November 25, 2025 nomination notice and December 8, 2025 proxy statement failed to disclose relevant and material matters concerning Defendants Howe and Holliday's relationship with Milfam, rendering the resolutions appointing them to the Scully Board invalid. The Judgment confirmed that the Milfam directors never had authority to operate on the Company's behalf, and that the existing Scully Board continues to maintain control over Scully's corporate affairs. And although Scully's appeal in the First Cayman Proceeding remains pending, the outcome of that appeal is now likely academic in light of the Judgment.

28. On July 8, 2026, the Company issued a Form 6-K and furnished as an exhibit the Company's July 7, 2026 press release that announced the Judgment and clarified that Scully's Board of Directors and management remained unchanged and that Milfam and its nominees never had authority to act on behalf of the Company. The press release also informed shareholders that SEC filings made since January 1, 2026, purportedly on behalf of the Company, were unauthorized, misleading and inaccurate and should be disregarded in their entirety, and that the Form 3 reports filed by Howe and Freund were improper and incorrectly filed.

29. On July 8, 2026, both Freund and Howe filed amendments to their March Form 3 filings, confirming that they are not, and never were, directors of Scully.

30. From the November 2025 beginning of the proxy contest forward, none of the Defendants disclosed that they were working as a group, or that their combined voting power was at approximately 48.5%. All that Defendants needed to do was to make their coordination public by filing a simple disclosure on Schedule 13D. No

Defendant did that. Instead, Milfam proposed a slate of directors to take over the Scully Board, purporting to act alone, all the while working behind the scenes with the other Defendants in an effort to seize and effectuate their control of Scully. Investors still lack basic information about the group's composition, agreements, and which shareholders supposedly approved Milfam's slate at the 2025 Annual Meeting.

31. On July 15, 2026, Plaintiff filed its original complaint in this action, highlighting Milfam and Kellogg's failure to disclose their coordination in connection with the 2025 proxy contest.

32. Two weeks later, on July 31, 2026, both Kellogg and Milfam filed Amended Schedule 13Ds, stating that, among other things, Kellogg and Milfam (with their affiliated entities) were operating as a "group" under Section 13.

33. Specifically, the amended Schedule 13D filings reported that "[t]he members of Reporting Group [Milfam and Kellogg] have engaged in discussions for the Reporting Persons [Milfam] to nominate the MILFAM Nominees for election at the next annual general meeting of shareholders held by the issuer" and that "[t]he Reporting Group intends to vote together in favor of the MILFAM Nominees and against the current directors of the Issuer." The Amended Schedule 13Ds said nothing about Milfam and Kellogg's prior coordination in the 2025 proxy contest. Instead, the Amended Schedule 13Ds state that the filers "deny that they acted as a group with any of the other defendants during the period addressed in the Issuer's complaint. The Reporting Persons did not decide to act as a group (on a go-forward basis) with any of the other defendants

named in the complaint until immediately prior to the filing of this" amended Schedule 13D.

34. This conduct violates Section 13(d) and warrants injunctive and declaratory relief and corrective disclosures.

**THE PARTIES**

35. Plaintiff Scully Royalty Ltd. is a foreign private issuer traded on the New York Stock Exchange as "SRL." The Company owns a 7% royalty interest in the Scully mine, an iron mine located in Canada. The Company's royalty interest has provided predictable, multi-million-dollar revenues to the Company and dividends to its shareholders for the last 50 years. The royalty generates an estimated annual revenue of $35 million and expires in 2055. Michael J. Smith serves as Scully's Executive Chairman, and as announced by the Company in a press release furnished with a Form 6-K filed with the Securities and Exchange Commission (the "SEC") on August 14, 2026, also now serves as the Company's Interim Chief Executive Officer and Chief Financial Officer (hereinafter referred to as "Smith" or "Executive Chairman"). Samuel S. Morrow served as Scully's Chief Executive Officer and Chief Financial Officer during the majority of the time period relevant to this action, and as announced by the Company in a press release furnished with a Form 6-K filed with the SEC on August 14, 2026, now serves only as a non-executive director of the Company (hereinafter referred to as "Morrow" or "CEO").

36. Defendant IAT Reinsurance Co. Ltd. ("IAT") is a Cayman Islands exempted company headquartered at Building 4, 2nd Floor, 23 Lime Tree Bay Avenue,

Governors Square, Cayman Islands and is registered to receive mail in the United States at 48 Wall Street, New York, New York 10005. IAT purports to do business throughout the United States; its website lists more than 50 "agent partners" in the states of Florida and New York alone. IAT is listed as a related party to Peter Kellogg in Kellogg's July 25, 2022 Schedule 13D filing, and IAT holds shares in Scully.

37. Defendant IAT Insurance Group, Inc. is a wholly owned subsidiary of IAT. IAT Insurance Group is controlled by Peter Kellogg and holds shares in Scully through its subsidiary, Harco National Insurance Company.

38. Defendant Peter Kellogg is a billionaire and former President and Chief Executive Officer of IAT. Since resigning from management, Kellogg continues to exercise oversight of IAT in his role as Chairman. As of July 31, 2026, when Kellogg filed his most recent Schedule 13D amendment, Kellogg identified IAT, IAT Insurance Group, Charles Kellogg, Goose Creek Capital, and Harco National Insurance Company as related parties and as related "Reporting Persons" that have entered into a joint filing agreement with Peter Kellogg to file Schedule 13D on a coordinated basis, based on their ownership of Scully shares. Kellogg reported beneficial ownership of 5,400,010 shares of the Company, or approximately 35% of the Company's current voting power.

39. Defendant Charles Kellogg is Peter Kellogg's son. Charles Kellogg has controlled IAT since approximately 2020 or 2021 and is the beneficial owner of approximately 23% of the Company's current voting power.

40. Defendant Goose Creek Capital, Inc. is an entity wholly owned by Charles Kellogg and controlled by Peter Kellogg. It holds shares in Scully and owns IAT.

41. Defendant Harco National Insurance Company is an entity controlled by Peter Kellogg that holds shares in Scully. It is a wholly owned subsidiary of IAT Insurance Group, Inc.

42. Defendant Milfam LLC is a Delaware limited liability company headquartered at 2336 SE Ocean Boulevard, Suite 400, Stuart, Florida. Milfam is a single-family office managing the collective assets of the descendants of Lloyd I. Miller, Jr, and the beneficial owner of 1,985,952 shares of the Company, or approximately 13% of the Company's current voting power.

43. Defendant Neil Subin is the President, Chief Investment Officer, and Manager of Milfam LLC. Subin signed Milfam's Schedule 13D filings across the relevant time period and resides in Stuart, Florida.

44. Defendant Skyler Wichers has served as an executive and portfolio manager of Milfam since 2019. Wichers was a Milfam nominee to the Company's Board.

45. Defendant Alan Howe serves on Milfam's Management Oversight Committee. Howe was a Milfam nominee to the Company's Board.

46. Defendant Mark Holliday was a Milfam nominee to the Company's Board.

**<u>JURISDICTION AND VENUE</u>**

47. This is a civil action arising under Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), and the rules and regulations promulgated thereunder.

48. This Court has subject-matter jurisdiction over this action pursuant to federal question jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa.

49. This Court has supplemental jurisdiction over Plaintiff Scully's state law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise out of the same case or controversy as Plaintiff's federal securities law claim and derive from a common nucleus of operative fact.

50. This Court has personal jurisdiction over IAT because it regularly and systematically conducts business in the state of Florida.

51. This Court has personal jurisdiction over Peter Kellogg and Charles Kellogg based upon their oversight and control of IAT.

52. This Court has personal jurisdiction over Milfam because it is headquartered in Florida, and because it took actions including issuing press releases from Stuart, Florida, in connection with the attempt to effectuate a change in control of Scully.

53. This Court has personal jurisdiction over Subin because he is President of Defendant Milfam and because he is a Florida resident.

54. The Court has personal jurisdiction over Wichers because he is the portfolio manager of Milfam and because he was a Milfam nominee to the Scully Board.

55. This Court has personal jurisdiction over Howe because he serves on Milfam's Management Oversight Committee and because he was a Milfam nominee to the Scully Board.

56. This Court has personal jurisdiction over Holliday because he was a Milfam nominee to the Scully Board.

57. This Court also has personal jurisdiction over each and all of the Defendants because, on information and belief, each participated in communications to effectuate a change of control in Scully and/or formed a group for that purpose, culminating in the press release that Milfam issued from Stuart, Florida, which was furnished with the SEC purportedly on behalf of Scully.

58. Venue in this District is proper pursuant to 28 U.S.C. § 1391 and Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa, because Defendants are subject to personal jurisdiction in the state of Florida and the claims in this action arise from acts or transactions that occurred within the Southern District of Florida. Among other things, Defendant Milfam's misleading 13D filings were transmitted from its Florida headquarters, signed by Florida resident Subin, and the address provided on each relevant Milfam Schedule 13D filing is located within this District.

## **FACTUAL BACKGROUND**

### **A. Scully Royalty Creates Value for Shareholders**

59. Scully is a foreign private issuer (a non-governmental, non-U.S.-based entity that is not primarily owned by U.S. stockholders) whose stock trades on the New York Stock Exchange as "SRL." Scully owns a 7% royalty interest that expires in 2055 in an iron mine in Canada, which generated annual revenue of approximately $35 million. Scully leverages those royalties to create value for its shareholders.

60. The Company's royalty interest has provided predictable, multi-million-dollar annual revenue to the Company for the last 50 years. The mine produces an estimated three million metric tons of iron ore per year, and the mine sits on iron ore deposits approximating 700 million tons. The mine's ore contains 65% iron, which commands a premium on the global markets. The mine also relies on hydroelectric energy, reducing the carbon emissions associated with its operations and generating iron ore for shipment that is more environmentally friendly and desirable than other options on the market.

61. The Company, through its Board and officers, has guided Scully to strategic prioritization of its mining royalty interest and has streamlined a diverse asset portfolio. Despite the fact that the Scully mine was out of operation from 2014 until August 2019, the Company's management team successfully reoriented Scully's assets, yielding significant cash dividends to shareholders regularly since 2021.

62. Like other publicly traded companies, Scully holds an annual meeting of shareholders. Consistent with its prior practice, in November 2025, Scully announced that it planned to hold its 2025 Annual Meeting at the Company's office in Hong Kong on December 27, 2025.

**B. Defendants Fail to File Accurate Schedule 13D Disclosures**

63. Section 13 of the Exchange Act targets collaboration where investors work as a "group" to achieve some particular objective with respect to a public company. Section 13(d) requires any person that beneficially owns 5% or more of a company's stock to publicly disclose its position by filing a Schedule 13D. Relevant here, Section

13(d) requires any group formed for the purpose of acquiring, holding, or voting the stock of a company to disclose the group's existence if the group members collectively beneficially own 5% or more of an issuer's stock. Such persons and groups must file Schedule 13D to disclose this information to investors and must promptly amend Schedule 13D to disclose material changes, including agreements regarding board control.

64. In the Company's Annual Report filed on Form 20-F on April 30, 2025, Scully identified Kellogg and Milfam (as manager, general partner or investment advisor of entities formerly managed by the late Lloyd Miller, III) as the only persons known to beneficially own more than 5% of the Company's shares, holding 35.7% and 13.6%, respectively. The Company's later Form 6-K filing, dated December 5, 2025, disclosed similar information regarding its major shareholders.

65. Defendant Kellogg has an extensive history with Scully, having previously waged a 2013 proxy contest at the Company and serving as Board Chair from 2014 until his resignation in 2015.

66. Defendant Kellogg's last Schedule 13D disclosure of his ownership of Scully stock before the takeover attempt was dated July 25, 2022—over three years before Defendants' contest—and reported that Kellogg beneficially owned shares that constituted approximately 35% of Scully's current voting power.

67. Defendant Kellogg also has a history of violating Section 13(d). In 2014, the Securities and Exchange Commission ("SEC") ordered Kellogg to cease and desist from committing or causing any violations and any future violations of Section 13(d) and

to pay a penalty of $100,000 because he failed to timely file required disclosures with respect to his ownership of stock in Scully's predecessor and other companies.

68. Defendant Milfam filed a series of Schedule 13D disclosures of its ownership of Scully stock, which reported beneficial ownership of shares constituting approximately 13% of Scully's current voting power. Milfam filed a series of Schedule 13D amendment filings on November 26, 2025, December 8, 2025, December 19, 2025, and December 29, 2025. Neither the Nomination Notice, nor these Schedule 13D amendment filings, disclosed the existence of the group or agreements regarding the control of Scully's Board as required by Section 13(d).

69. Milfam's Schedule 13D, filed November 26, 2025, announced its control contest and disclosed a proposed slate of directors as well as Milfam's intention to solicit proxies from other shareholders to vote in favor of the Milfam proposed directors. That same filing also announced that: "The Reporting Persons have also engaged in preliminary discussions with other shareholders of the Issuer regarding its proposal to remove the existing members of the Board and to elect the Nominees to the Board." Milfam repeated this statement verbatim in both of its subsequent Schedule 13D filings on December 8, 2025—without ever disclosing to the public who those "other shareholders" were, or the nature of their "preliminary discussions" regarding the proposal to remove existing Board members.

### C. Milfam Launches a Control Contest for Scully Pursuant to Incomplete Proxy Materials

70. On November 26, 2025, shortly after Scully announced the 2025 Annual Meeting, Milfam announced that it was launching a control contest for Scully. Milfam

nominated a slate of directors for election to unseat and replace the current Scully Board and announced its intent to solicit other Scully stockholders to support its nominees for election at the upcoming 2025 Annual Meeting. Milfam's November 26, 2025, December 8, 2025, December 19, 2025, and December 29, 2025 SEC filings regarding the control contest were signed by Defendant Subin on behalf of Milfam.

71. Specifically, on December 8, 2025, Milfam circulated proxy materials proposing a slate of five director candidates—Jerrod Freund, Mark Holliday, Alan Howe, Nimesh Patel, and Skyler Wichers (the "Milfam Nominees")—for election at the Company's 2025 Annual Meeting. At the time of the proxy filing, Milfam beneficially owned approximately 13% of Scully's voting power.

72. Milfam's proxy materials contained a number of inaccuracies and material omissions that obscured the relationships between Milfam and the Milfam Nominees. For example:

a. Milfam proxy materials did not disclose to investors that Milfam nominee Alan Howe was a member of Milfam's Management Oversight Committee, was a director and officer of other Milfam-owned and/or controlled entities and received compensation from Milfam in connection with these positions. As part of the Management Oversight Committee, Howe has the responsibility of determining Defendant Subin's compensation, deciding whether he is removed or retained as President, approving transactions where Subin may be conflicted and exerting an important supervisory role over the

affairs of Milfam. The proxy also failed to disclose that Milfam owns over 90% of Anacomp Inc., an entity where Howe has been a director since 2007 and now serves as Chairman.

b. Milfam's proxy materials did not disclose to investors that Milfam nominee Mark Holliday also has an extensive history with Milfam. Holliday has served on boards of companies in which Milfam was the largest shareholder, including Alimco Re Limited, where Defendant Howe also serves on the board along with Defendant Wichers. Holliday has also maintained significant and longstanding professional and fiduciary relationships with Defendant Subin, Milfam's President, having acted as a trustee for Subin.

c. Milfam's proxy materials did not disclose to investors that Milfam nominee Wichers had actively worked with Subin since the age of 15.

73. These omissions were material to Scully shareholders because, by concealing these relationships, Scully shareholders could not assess the level of control Milfam might be able to exercise over the Milfam Nominees if they were elected in the 2025 Proxy Contest. The Judgment in the Second Cayman Proceeding has since confirmed that Milfam's proxy materials contained inadequate disclosures with respect to Howe and Holliday.

74. Scully evaluated Milfam's proxy materials and nomination notice and concluded that the nomination did not comply with the requirements of Scully's corporate charter. Specifically, the nomination notice failed to meet the required

timelines prescribed by the advance notice provisions found at Article 20.2(a), which required that the nomination notice be provided "not later than the close of business on the tenth (10th) day following the notice date." Scully accordingly advised Milfam on December 5 and publicly informed shareholders on December 12, 2025 that Milfam's nomination notice was invalid.

**D. Milfam Files Litigation Against Scully and Attempts to Do Business at an Annual Meeting**

75. On December 10, 2025, Milfam filed a lawsuit initiating the First Cayman Proceeding in the Grand Court of the Cayman Islands, seeking a declaratory judgment that its director nomination complied with the Company's advance notice requirements. The court entered oral judgment in Milfam's favor on December 19, 2025, and issued a written judgment on December 23, 2025. Scully appealed to the Cayman Islands Court of Appeal the same day the written judgment was entered. That appeal remains pending.

76. Given the ongoing legal proceedings and the material deficiencies in the Milfam proxy, on December 24, 2025, Scully's Board announced that it was postponing the 2025 Annual Meeting to allow time for the Court to rule and to ensure shareholders were allowed a fully informed and fair election. This announcement was promptly made in a press release to Scully's shareholders. Scully had also issued two Forms 6-K on December 22, 2025, alerting shareholders to material deficiencies in the Milfam proxy, including Howe's and Holliday's undisclosed entanglements with Milfam.

77. Rather than await the appellate court's ruling or respect the announcement of the duly elected Scully Board, Milfam immediately declared on December 26, 2025, that it would nonetheless proceed with convening the 2025 Annual Meeting. Milfam did

not articulate any reason why it had to hold the meeting so quickly. Given that there was no rush to hold the election prior to the resolution of the First Cayman Proceeding, it can be inferred that Milfam's actions were designed to wrest control of the Company away from the Board at a time when, due to the conflicting announcements over the holiday period, Scully's other shareholders could not have been certain of the 2025 Annual Meeting's status. Just one day later, and with next to no notice to Scully's shareholders, on December 27, 2025, Milfam and its associates sought to hold the 2025 Annual Meeting in the hallway outside the Company's Hong Kong office. It was attended by only two junior Milfam employees and several of their outside counsel from multiple law firms. Milfam claimed that one of the junior Milfam employees chaired the meeting and, by proxy, voted a majority for Milfam's slate.

78. On December 29, 2025, Scully filed a Form 6-K announcing that no valid meeting had occurred and that the purported vote was invalid. The Company explained that the 2025 Annual Meeting had not yet occurred but had been postponed, that the Board remained in place, and that the Company had "informed MILFAM of the invalidity of its unilateral actions" during the postponement. The Company further urged the shareholders to rely only on official communications from the Company, and later became aware that Milfam had been attempting to communicate with shareholders using an "SRL-Board@outlook.com" email address. On information and belief, that email address was created by Milfam and was not approved by anyone at Scully.

79. Seeking to further consolidate its position, Milfam filed the Second Cayman Proceeding in the Grand Court of the Cayman Islands on January 5, 2026, this

time seeking a declaration that (i) Scully's December 24 postponement of the 2025 Annual Meeting was invalid; (ii) the 2025 Annual Meeting held on December 27 was valid; and (iii) Milfam's director slate had been elected to the Scully Board. Milfam also asked for an order requiring Scully to name its nominees to the Scully Board.

### E. Scully Later Learns That Milfam, Kellogg, and their Affiliates Formed an Undisclosed Group for the Control Contest

80. Unbeknownst to Plaintiff at the time, Milfam had not orchestrated this control contest on its own. Later events revealed that, on information and belief, Milfam formed an undisclosed group with Kellogg and the other Defendants to facilitate its attempt to improperly seize control of Scully.

81. Peter Kellogg is a beneficial owner of approximately 35% of Scully's shares, along with his son, Charles Kellogg, and their affiliated entity, IAT. Kellogg is the former CEO of IAT and currently serves as its Chairman.

82. Non-party David Pirrung is the Chief Financial Officer of IAT Insurance Group Inc., a corporation headquartered in North Carolina that is a wholly owned subsidiary of IAT Reinsurance Company Ltd. Pirrung reports directly to Peter Kellogg and Charles Kellogg. On information and belief, Pirrung attended multiple meetings with Milfam and the Milfam Nominees on behalf of Kellogg in connection with the 2025 control contest for Scully.

83. Around the time of and after the 2025 Annual Meeting, Scully Executive Chairman Smith and Scully CEO Morrow had discussions with Kellogg and Pirrung regarding purported shareholder concerns. Taken together, those interactions strongly

suggest that Kellogg was coordinating with Milfam to support its contest for control of Scully.

84. Before Scully's Board had announced the postponement of the 2025 Annual Meeting, Scully's CEO, Morrow, reached out to Kellogg to get his input and feedback regarding shareholder concerns. On information and belief, during that telephone conversation, which took place on December 16, 2025, Kellogg advised Morrow that Milfam's President, Subin, had discussions with certain of Kellogg's "guys" in Raleigh regarding shareholder concerns. On information and belief, Pirrung was one of the "guys."

85. A few weeks later, on January 19, 2026, during a telephone conversation between Pirrung and Morrow to discuss a potential Board compromise, on information and belief Pirrung confirmed that he spoke with representatives of Milfam "once or twice." On information and belief, Pirrung also confirmed that—after the telephone call—he would speak to both Kellogg and Milfam nominee Wichers about Morrow's proposed Board compromise, strongly suggesting that Kellogg and Milfam (through its executive and board nominee, Wichers) were coordinating on both the Board election and the post-2025 Annual Meeting governance of the Company. There would be no reason for one of Kellogg's "guys" to be involved in any discussions about Scully's Board composition with Milfam if Kellogg was not collaborating with Milfam and the Milfam Nominees.

86. Even further suggestive of Kellogg's intent, Kellogg wrote in a January 27, 2026 email to Morrow regarding the 2025 Annual Meeting: "The hand writing is on

the wall – Time to adjust – Dave can speak for us Best." On information and belief, Kellogg was referring to David Pirrung, Chief Financial Officer of IAT Insurance Group, Inc.

87. On information and belief, during 2026, Peter Kellogg, Pirrung and Wichers communicated about the proxy contest and how the Milfam Nominees could effectuate their control over Scully.

88. On information and belief, on or before April 7, 2026, Wichers, acting on behalf of Milfam, and Peter Kellogg entered into an agreement to have Milfam and Kellogg board nominees, including David Pirrung, appointed to Scully's Board in place of incumbent directors.

89. Neither these individuals, nor any of the Defendants, disclosed their mutual objective of effectuating a change of control at Scully to shareholders as required under Section 13(d). Once two persons enter into even an "understanding" to effectuate a change of control in a publicly traded company, they must file a Schedule 13D indicating as much to public shareholders.

90. Milfam and its affiliates caused to be filed two Forms 6-K, dated January 14 and January 15, 2026, purportedly made on behalf of Scully by Wichers, claiming to have terminated the Company's chief executive officer and to have validly elected a new slate of directors—and signed by Wichers, who held himself out to public shareholders as "Chairman of the Board" of Scully and through his representatives pressured the Company's EDGAR filing firm, Toppan Merrill, to file the Forms 6-K without the existing Board's approval. Further, two SEC Forms 3 were filed by Milfam Nominees

Howe and Jerrod Freund on March 18 and March 26, 2026, where each identified themselves as newly-elected directors of Scully. Freund and Howe's Form 3 filings, purportedly identifying themselves as directors of the Company following the 2025 Annual Meeting, are illustrative of their ongoing ties to Milfam, which they later both withdrew on July 8, 2026 in Form 3 Amendments, citing to the Judgment and disclosing that at no point did they have the requisite legal authority to act as directors of the Company.

91. On information and belief, Wichers and Milfam filed the aforementioned Forms 6-K on behalf of Scully by improperly pressuring the Company's third party filing firm, Toppan Merrill, to file the flawed January 14 and January 15, 2026 Forms 6-K. The Company has a history of working with Toppan Merrill to finalize and publish the Company's SEC filings as part of its regular course of business.

92. On July 8, 2026, Scully filed a Form 6-K that explained to shareholders that its Board and management remained unchanged and that the SEC filings Milfam and its principals had directed under the Company's name on January 14, 2026 and January 15, 2026 were incorrect and filed without authorization. In its press release furnished with the Form 6-K, the Company informed shareholders that, as a result of the Milfam group's conduct, the Company was unable to meet required filing deadlines, leading to an order by the NYSE that suspended trade of the Company's common shares on May 12, 2026. The Company also informed shareholders that its independent auditor had resigned.

93. Wichers and Subin are employees and managers of Milfam. They have served alongside Howe and Holliday on boards of Milfam-controlled companies for years, and Howe has been a member of Milfam's investment committee.

94. On information and belief, Wichers and Subin selected Howe and Holliday as nominees to the Scully Board in order to continue expanding Milfam's influence and control over publicly traded companies and did so without disclosing Howe and Holliday's substantial relationships with Milfam, in a move the Second Cayman Proceeding held left public shareholders without enough information to make an informed decision during voting.

**F. Kellogg's Prior Section 13(d) Violations**

95. The SEC has previously found that Kellogg violated Section 13(d) in connection with Scully's predecessor and other companies.

96. Kellogg's beneficial ownership of shares in Scully and its predecessor entities dates back to at least 1999. Between November 2013 and December 2013, Kellogg initiated a contentious proxy contest (the "2013 Proxy Contest") with the Scully Board in which he sought to expand the Scully Board to 11 seats and nominate eight individuals to serve on the Scully Board, including himself.

97. In response to the Kellogg-initiated proxy contest, MFC Industrial Ltd. ("MFC")—Scully's previous name—initiated a Section 13(d) lawsuit on November 25, 2013 in the Southern District of New York against Peter Kellogg, Charles Kellogg, IAT, and other members and affiliates of the Kellogg family for failing to disclose Kellogg's intention to seek control of MFC.

98. Rather than filing a responsive pleading, on February 7, 2014, Kellogg entered into a mutual settlement agreement with MFC to resolve the case. In return for MFC voluntarily dismissing the pending litigation with prejudice, Kellogg, IAT, and their affiliates agreed, *inter alia*, to not "form or join in a partnership, limited partnership, syndicate or other group, including, without limitation, a group as such term is used in Section 13(d) of the Exchange Act" with unrelated third parties absent MFC Board approval that was binding until 2016. The settlement agreement also permitted Kellogg to maintain the seat he received on the Scully Board during the 2013 Proxy Contest.

99. Less than a year later, on September 10, 2014, the SEC announced charges (the "Enforcement Announcement") against a number of corporate insiders for reported failures to timely file ownership and insider reports pursuant to Sections 13 and 16 of the Exchange Act, including Kellogg and four other individuals with "especially high rates of filing deficiencies." In connection with this enforcement initiative, the SEC instituted a cease-and-desist proceeding against Kellogg pursuant to SEC Administrative Proceeding File No. 3-16073. Kellogg was found to have violated reporting requirements with respect to holdings in four publicly traded companies, including Scully.

100. Specifically, the SEC charged Kellogg with failure to timely file initial or required amendments to Schedule 13D and failure to timely file multiple reports of transactions. With respect to his holdings in the Company (formerly known as MFC Industrial Ltd.), this included a failure to file multiple required Schedule 13D amendments during a period of more than 12 years from October 2000 to January 2013. As a result, Kellogg was ordered to (i) cease and desist from committing or causing any

violations and future violations of Sections 13(d) and 16(a) of the Exchange Act and Rules 13d-1, 13d-2, and 16a-3 promulgated thereunder, and (ii) pay a civil money penalty to the SEC in the amount of $100,000.

101. Kellogg's 13(d) violations did not stop there. Even after being fined by the SEC, Kellogg did not update his Schedule 13D—which was filed on February 10, 2014—until July 25, 2022. That leaves an *eight-year gap* during which Kellogg made no amendments or updates to his Schedule 13D. However, during that time, multiple events happened that should have triggered amended Schedule 13D filings.

102. Pursuant to Rule 13d-2(a), amendments to Schedule 13D are required to report any material change to the information set forth in a previously filed Schedule 13D, including acquisitions or dispositions that constitute one percent or more of the outstanding common shares (the "1% Threshold"), within two business days of such a change. Kellogg's February 10, 2014 Form 13D/A reported beneficial ownership of 20,662,400 Scully shares, or 33% of the Company's outstanding stock. A few years later, on July 13, 2017, the Company made an approximately 5:1 reverse stock split (the "Stock Split"). Based on the Stock Split, Kellogg would have beneficially held approximately 4,132,480 Scully shares on a split-adjusted basis as of February 2014. On Kellogg's July 2022 13D/A, he reported beneficial ownership of 5,293,276 Scully shares. This means Kellogg acquired at least 1,160,796 additional Scully shares on a split-adjusted basis between the February 2014 13D/A and the July 2022 13D/A—far exceeding the 1% threshold.

103. Further, Kellogg reports holding shared dispositive and voting power over shares held by IAT Reinsurance Co. Ltd. IAT reported beneficial ownership of 13,405,000 Scully shares on the February 2014 13D/A. However, a review of the Form 13F filings made by IAT reveals significant fluctuations in beneficial ownership that likely triggered multiple amendment filings between the February 2014 13D/A and the July 2022 13D/A. In particular:

a. IAT's Form 13F filed on February 3, 2016, for the quarter ended December 31, 2015, reported that IAT held only 793,869 Scully shares, reflecting a potentially dramatic decrease in Scully shares beneficially held as compared to the 13,405,000 Scully shares reported in the February 2014 13D/A.

b. On November 14, 2016, IAT filed a Form 13F for the quarter ended September 30, 2016, which reported 13,662,400 Scully shares held by IAT, reflecting a potentially dramatic increase from the prior quarter.

c. On May 14, 2019, IAT filed a Form 13F for the quarter ended March 31, 2019, which reported 2,444,422 Scully shares held.

d. On November 15, 2019, IAT filed a Form 13F for the quarter ended September 30, 2019, which reported 2,732,477 Scully shares held.

e. On August 13, 2021, IAT filed a Form 13F for the quarter ended June 30, 2021, which reported 2,978,399 Scully shares held.

f. On February 11, 2022, IAT filed a Form 13F for the quarter ended December 31, 2021, which reported 3,216,668 Scully shares held.

104. Kellogg and IAT's failure to make timely and complete 13D/A filings deprived Scully shareholders of the ability to ascertain the material changes to those amounts that occurred during the eight-year period.

105. According to recent filings with the SEC, Kellogg continues to hold shared voting and dispositive power over all stock held by IAT. However, public records in North Carolina and Nebraska indicate that the ultimate ownership of IAT was transferred in or around February 2021 to Charles Kellogg. Until after the filing of this lawsuit, Charles Kellogg had never before reported beneficial ownership of Scully shares, nor any other securities held by IAT.

106. Peter Kellogg's decision on July 31, 2026 to disclose shares held by Charles Kellogg in Scully as of 2021 (approximately 23.6% of the Company), which Peter Kellogg failed to disclose in his July 25, 2022 Schedule 13D is late and incomplete. The disclosure takes place in the same filing by Kellogg announcing group formation with the Milfam entities. Peter Kellogg's approach—selectively disclosing only a part of the required information owed to shareholders and not the complete picture, while announcing an intent to take over—is not only inconsistent with regulations: it has left Scully's shareholders in the dark, especially on changes to ownership in a group that wields more than 35% of the Company's stock during the four years since Kellogg's last Schedule 13D.

107. In any event, prior to the Amended Schedule 13Ds, Charles Kellogg and Peter Kellogg violated Section 13(d) by failing to disclose that Charles Kellogg is acting as part of the Kellogg and IAT group.

108. Even after Kellogg's July 31, 2026 Schedule 13D filing, shareholders are currently unable to assess the nature and scope of Kellogg's relationship with Milfam during the November 26, 2025 to July 31, 2026 time period.

109. On information and belief, Kellogg's July 31, 2026 statement—that he and his entities "did not decide to act as a group (on a go-forward basis) with any of the other defendants named in the complaint until immediately prior to the filing of this Amendment"—appears to be incomplete and does not provide the full disclosure to shareholders required under Section 13(d).

110. Complete disclosure regarding whether Kellogg and Milfam formed or operated as a group during the period from November 26, 2025 to July 31, 2026 constitutes material information for Scully's shareholders.

111. On information and belief, the Kellogg-Milfam group formation during this time period triggered the disclosure requirements of Section 13(d) and its implementing regulations.

112. Scully's shareholders are owed under federal law the full scope of disclosures on Kellogg and Milfam's group formation during the proxy contest so that they may be fully informed at the "extraordinary general meeting of the shareholders" that Milfam and Kellogg have announced and intend to call as one option to effectuate their joint intent of "removal of the current directors," as disclosed in both Schedule 13D filings made by Kellogg and Milfam on July 31, 2026.

113. Not only do Kellogg's SEC filings fail to report accurate, up-to-date information about his beneficial ownership and any groups or coordination efforts he is a part of, his Form 13D/As also fail to make other required disclosures.

114. For example, Item 2(e) of Schedule 13D requires disclosure, during the last five years, of any "civil proceeding of a judicial or administrative body of competent jurisdiction" that resulted in "a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws." The SEC Order falls squarely within this disclosure requirement, as it ordered Kellogg to cease and desist from future violations of beneficial ownership reporting requirements. Kellogg should have amended his Schedule 13D promptly to disclose the SEC Order.

115. In another example, Kellogg's 13D/A failed to disclose that Kellogg was appointed to—and then promptly stepped down from—Scully's Board. Indeed, Item 4(d) of Schedule 13D requires amendment where there is "any change in the present board of directors or management of the issuer." On March 22, 2014, Kellogg was appointed Chairman of the Scully Board. In that role, Kellogg assumed a position of greater leadership and gained a heightened degree of control and influence over the Company. On July 20, 2015, Kellogg stepped down from the Scully Board entirely, which materially changed his level of influence and control over the Company. These updates should have been reported.

116. Kellogg's July 2022 13D/A also contains a number of significant technical deficiencies, which render the filing confusing and materially deficient. For instance,

Item 3 of Schedule 13D requires disclosure of the "amount of funds or other consideration used or to be used in making" purchases described in the filing, and "[w]here material, such information should also be provided with respect to prior acquisitions not previously reported pursuant to this regulation." This information was not provided for the Scully shares reported as purchased in Item 5(c), nor for the substantial acquisition of Scully Shares that occurred since the February 2014 13D/A.

117. Further, Instruction C to Schedule 13D requires that if a reporting person is a corporation, disclosures under Items 2 through 6 of Schedule 13D must be provided for "(a) each executive officer and director of such corporation; (b) each person controlling such corporation; and (c) each executive officer and director of any corporation or other person ultimately in control of such corporation." The executive officers and directors of IAT, other than Kellogg himself, were never disclosed on any Schedule 13D filing.

118. Kellogg's 13D violations are not limited to those associated with his and his affiliates' holdings in the Company.

119. For example, similar potential violations were apparent in Kellogg's beneficial ownership reporting with respect to common shares of Nam Tai Property Inc. ("Nam Tai"). For example, Kellogg filed a Schedule 13D related to Nam Tai in 2004, and did not file an amendment to that Schedule 13D until approximately 16 years later in 2020. During that time, IAT filed various Form 13F filings that suggest meaningful changes in Kellogg's ownership of Nam Tai shares, without expected corresponding Schedule 13D amendments by Kellogg.

### G. The Cayman Court Rules in Scully's Favor

120. On July 2, 2026, the Cayman Court in the Second Cayman Proceeding returned a judgment finding that the resolutions passed at the 2025 Annual Meeting were invalid. Specifically, the Court found that Section 18.1 of Scully's Articles did not grant shareholders the power to appoint a meeting chairman, as Milfam had attempted. Accordingly, the court found that no business could validly be conducted at the 2025 Annual Meeting, meaning the Milfam Nominees were not validly elected.

121. The Court also found that, consistent with Scully's December 22, 2025 Form 6-K notice to its shareholders, Milfam's November 25, 2025 nomination notice and proxy statement contained inadequate disclosures with respect to Defendants Howe and Holliday. Therefore, even if the procedures outlined in Scully's Articles had been followed, the Court determined that Howe and Holliday's elections were nevertheless invalid. For this reason, even if the First Cayman Proceeding is finally resolved in Milfam's favor, and the court finds that Milfam validly nominated the Milfam Nominees on time, the Second Cayman Proceeding's Judgment means that the nominations of both Howe and Holliday were not valid, and that no valid business was conducted at the 2025 Annual Meeting regardless, up to and including the so-called election of the Milfam Nominees to the Scully Board.

122. Following the Judgment in favor of the incumbent Board, Defendant Howe filed an amended Form 3 on July 8, 2026, characterizing his prior March 18, 2026 filing—which identified Howe as a purported member of the Scully Board—as being "in error." Howe stated: "The Reporting Person is not a director of the Issuer," and that in

light of Judgment issued by "the Grand Court of the Cayman Islands," "there was a failure to appoint any directors, including the Reporting Person, and the incumbent directors remain in office until either their successors are elected or they otherwise cease to hold office." Freund filed a substantially identical amendment on the same day.

123. On July 8, 2026, the Company issued a Form 6-K, explaining to shareholders that the Company's Board and management remained unchanged and that the SEC filings Milfam and its principals had directed under the Company's name were incorrect and filed without authorization. The accompanying press release furnished with the Form 6-K also informed shareholders that, as a result of the Milfam group's conduct, the Company was unable to meet required filing deadlines, leading to an order by the NYSE that suspended trade of the Company's common shares on May 12, 2026. In addition, the Company's independent auditor resigned.

### H. Plaintiff Files the Initial Complaint and Defendants Amend Their Section 13 Disclosures

124. On July 15, 2026, Plaintiff filed its Initial Complaint in this action alleging that Milfam and Kellogg, together with the other named defendants, violated Section 13(d) by failing to disclose that they had been working together to replace the Scully Board with Milfam's nominees in the 2025 proxy contest.

125. Two weeks later, on July 31, 2026, Milfam and Kellogg filed the Amended Schedule 13Ds disclosing that they had agreed to work as a group to elect Milfam's slate of directors at the next annual or special meeting. Specifically, Milfam's Amended Schedule 13D stated:

> The members of Reporting Group have engaged in discussions for the Reporting Persons to nominate the MILFAM Nominees for election at the next annual general meeting of shareholders held by the Issuer, or for the Reporting Group to requisition an extraordinary general meeting of shareholders that will result in the removal of the current directors (subject to the below concerning Mr. Samuel Morrow) and the election of the MILFAM Nominees. The Reporting Group intends to vote together in favor of the MILFAM Nominees and against the current directors of the Issuer, whether at an annual general meeting of the shareholders or at an extraordinary general meeting of the shareholders, which may involve the Reporting Group delivering proxies to a representative of MILFAM, who will attend such meeting and vote the Reporting Groups' common shares. The Reporting Group expects that the MILFAM Nominees, if elected to the board, would replace the current management of the Issuer.

126. Kellogg's Amended Schedule 13D disclosed identical information:

> The members of Reporting Group have engaged in discussions for the Reporting Persons to nominate the MILFAM Nominees for election at the next annual general meeting of shareholders held by the Issuer, or for the Reporting Group to requisition an extraordinary general meeting of shareholders that will result in the removal of the current directors (subject to the below concerning Mr. Samuel Morrow) and the election of the MILFAM Nominees. The Reporting Group intends to vote together in favor of the MILFAM Nominees and against the current directors of the Issuer, whether at an annual general meeting of the shareholders or at an extraordinary general meeting of the shareholders, which may involve the Reporting Group delivering proxies to a representative of MILFAM, who will attend such meeting and vote the Reporting Groups' common shares. The Reporting Group expects that the MILFAM Nominees, if elected to the board, would replace the current management of the Issuer.

127. Even though the Amended Schedule 13Ds disclosed that Milfam and Kellogg would work together as a group at a future meeting, their disclosures said nothing about any prior coordinated efforts.

128. To the contrary, the Amended Schedule 13Ds disclosed the existence of this action and stated that "[t]he Reporting Persons did not decide to act as a group (on a

go-forward basis) with any of the other Defendants named in the complaint until immediately prior to the filing of this Amendment."

### I. Defendants Milfam, Wichers, Howe, and Subin Mount Demands on the Company's Independent Auditor

129. During the course of Milfam's campaign, Milfam, its President Subin, and the Milfam Nominees engaged in tortious interference with the Company's business relationships and contracts.

130. The Company appointed AOGB CPA Limited ("AOGB"), a certified public accounting firm headquartered in Hong Kong and registered with the U.S. Public Company Accounting Oversight Board, as the Company's independent accountant.

131. AOGB audited the Company's financial statements for the year ended December 31, 2024. The Company's Form 20-F Annual Report for 2024, filed April 30, 2025, includes AOGB's audit opinion.

132. The Company engaged AOGB to audit the Company's financial statements for the year ended December 31, 2025, which are to be included in the Company's Form 20-F Annual Report for 2025 (which has yet to be filed).

133. The Company has made the majority of its communications with AOGB through a Managing Director at AOGB.

134. On or about January 13, 2026, Wichers sent a letter to the same Managing Director at AOGB relating to the Company's audit through the email address "SRL-Board@outlook.com," with the subject line, "Scully Royalty Management Transition."

135. In the aforementioned email and letter, Wichers represented to the Managing Director that a change in Company management had occurred and requested that the Managing Director meet with Wichers.

136. On January 19, 2026, the Managing Director communicated with the Company and Scully Executive Chairman Smith, stating that "we will not disclose confidential or non-public information of the Company without proper authorisation and a clear legal or professional basis."

137. On or before January 25, 2026, the Managing Director responded to Wichers that he had received Wichers' letter dated January 12, 2026 "regarding the purported changes in the management and board composition" of Scully.

138. On information and belief, the Managing Director met with Wichers either in person or remotely.

139. Shortly thereafter, Howe, representing himself as part of the new board and as "the newly appointed Audit Committee Chairman" of Scully, emailed the Managing Director, thanking him for his time on a call and requesting confidential Company information held by AOGB.

140. The Managing Director responded by email, stating AOGB's need to remain "consistent with our professional, regulatory, and independence obligations."

141. On or before January 30, 2026, Howe emailed the Managing Director again. On information and belief, he requested access to all audit information from the FY2024 audit to be shared with the "new board," demanded that AOGB inform him and

the nominees of any communications between AOGB and the existing board, and requested AOGB to prepare an Audit Committee presentation for the new board.

142. On January 31, 2026, the Managing Director reached out to Scully Executive Chairman Smith and requested assistance in responding to Howe.

143. Howe continued to request the Managing Director to provide the Company's sensitive financial information to the Milfam nominees, despite Milfam's pending proceedings in the Grand Court of the Cayman Islands focused on directly determining the validity of the December 2025 contest.

144. On March 11, 2026, the AOGB Managing Director sent a letter to the Company formally resigning on behalf of AOGB as the independent registered public accounting firm for Scully.

145. On March 11, 2026, the AOGB Managing Director sent an email to the Company, including to its CEO, Chairman, and chair of the Audit Committee, resigning and stating that "[i]t has been a pleasure assisting with the FY2024 audit, and we appreciate the opportunity to have worked together."

146. Defendants' conduct interfered with the business relationship between Scully and AOGB and caused Scully harm. AOGB terminated its business relationship with the Company.

147. The Company was unable to comply with pending regulatory deadlines, and the NYSE placed a stock freeze on the trading of the Company's shares, depriving the Company of growth it would have enjoyed but for the interference, requiring the

Company to spend more to find an adequate replacement auditor with deadlines pending, and diminishing the Company's reputation amongst shareholders.

### J. Defendants Milfam, Wichers, Howe, and Subin Work Together to Interfere with the Company's Business Relationship with AOGB

148. On information and belief, Wichers, who held himself out as "Chairman of the Board" of Scully, worked with Howe, who held himself out as "chairman" of the Company's Audit Committee—and who claimed to be a director of Scully in a Form 3 filing before he withdrew his statement months later—to advance the purported "new board's" engagement with AOGB, based on the Form 6-K that Milfam caused to be filed under Scully's name on January 15, 2026.

149. On information and belief, Milfam, Wichers, Howe, and Subin knew that the Company had a business relationship with AOGB to provide auditing services for the year ending December 31, 2025.

150. Both Wichers and Howe directly emailed the Managing Director at AOGB on separate occasions, with no approval or consent from the Company's incumbent management, in order to gain AOGB's alignment on working with the "new board" on the Company's audit during the month of January 2026.

151. On information and belief, Wichers and Howe coordinated the "new board's" goals with respect to AOGB based on their purported positions of "Chairman of the Board" and "chairman" of the Audit Committee in the purported "new board" of Scully.

152. On information and belief, both Wichers and Howe were aware that Milfam initiated the Second Cayman Proceeding on or about January 5, 2026 in order to

determine whether the "new board" had been validly elected. Indeed, Wichers provided testimony in the Second Cayman Proceeding.

153. On information and belief, Wichers and Howe knew—before Wichers sent his initial email to the Managing Director on or before January 13, 2026—that there was legal ambiguity on whether or not the purported "new board" was legitimate under relevant law.

154. On information and belief, Wichers and Howe knew—before Wichers sent his initial email to the Managing Director on or before January 13, 2026—that Milfam had sought declaratory relief in the Second Cayman Proceedings on the issue of whether the Milfam Nominees constituted the new board of Scully.

155. On information and belief, Wichers and Howe also worked with Subin, who directed Milfam's priorities as its President, in the interference with the Company's relationship with AOGB.

156. Subin was the person responsible for filing and signing Milfam's Schedule 13D filings that announced its activist position against incumbent management during the November 2025 to December 2025 time period.

157. On behalf of Milfam, Subin signed and caused to be filed Milfam's Schedule 13D filings on November 26, 2025, December 8, 2025, December 19, 2025, and December 29, 2025.

158. Each aforementioned filing signed by Subin includes disclosures relating to Milfam's intention and/or plan to remove Scully's incumbent management.

159. On information and belief, Wichers and Subin discussed Scully's relationship with AOGB.

160. On information and belief, Subin as President of Milfam was aware of the Second Cayman Proceedings initiated by Milfam to decide the issue of whether the purported "new board" constituted the valid Board of Scully.

161. On information and belief, Subin was aware that, through January 2026, the Second Cayman Proceedings were pending and no judgment had been entered.

162. On information and belief, Subin was aware that the purported "new board" did not have authorization from incumbent management to form a separate "Audit Committee" chaired by Howe, and did not have authorization from incumbent management to engage with the Company's auditor on behalf of the Company.

163. On information and belief, Subin has served as a decades-long mentor and adviser to Wichers.

164. On information and belief, Subin advised Wichers on the purported "new board's" conduct towards AOGB.

### K. Defendants Milfam, Wichers, and Subin Pressure the Company's SEC Filer to Issue Unauthorized SEC Filings on Behalf of Scully

165. The Company retained Toppan Merrill to file corporate disclosures with the SEC on behalf of the Company.

166. The Company has worked with Toppan Merrill and its predecessor for more than a decade to format and file SEC filings on the Company's behalf and relied on Toppan Merrill as its sole filing agent to complete such legally required filings.

167. The Company has filed each of its corporate disclosures with the SEC from 2019 to 2025 by paying Toppan Merrill to format and file its disclosures via the SEC's EDGAR filing system.

168. On information and belief, on or before January 14, 2026, outside counsel representing the Milfam Nominees, including Wichers, and Milfam, represented to Toppan Merrill that the Milfam Nominees constituted the "new board" of Scully, and directed Toppan Merrill to file a Form 6-K on behalf of the Company.

169. On January 14, 2026, Toppan Merrill, acting at the direction of Milfam's outside counsel, caused a Form 6-K to be filed on behalf of Scully.

170. The January 14, 2026 Form 6-K stated that "On January 12, 2026, MILFAM LLC issued a press release titled, 'Scully Royalty Ltd. Board of Directors Terminates CEO and Commences Search for New CEO,' a copy of which is furnished herewith[.]"

171. The January 14, 2026 Form 6-K furnished as an exhibit a press release issued by Milfam from Stuart, Florida on January 12, 2026 and published through Globe Newswire, stating that Scully's CEO had been terminated "for cause" and including as contact information for "the New Board" the email address, "SRL-Board@outlook.com." "SRL" is the ticker symbol the Company trades under on the NYSE.

172. The Form 6-K filed January 14, 2026 on behalf of Scully was signed by "Skyler Wichers" as "Chairman of the Board."

173. Through signing the January 14, 2026 Form 6-K on behalf of Scully, Wichers attested that "Pursuant to the requirements of the Securities and Exchange Act of

1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized."

174. On information and belief, on or before January 15, 2026, outside counsel who represented Wichers, the Milfam Nominees, and Milfam represented that the Milfam Nominees constituted the "new board" of Scully to Toppan Merrill and directed Toppan Merrill to file a Form 6-K on behalf of the Company.

175. On January 15, 2026, Toppan Merrill, acting at the direction of Milfam's outside counsel, caused a second Form 6-K to be filed on behalf of Scully.

176. The January 15, 2026 Form 6-K stated that at the December 27, 2025 meeting, "the shareholders of the Company elected each of Jerrod Freund, Mark Holliday, Alan Howe, Nimesh Patel, and Skyler Wichers to the board of directors of the Company (the 'Board')."

177. The January 15, 2026 Form 6-K further stated that "Skyler Wichers was appointed Chairman of the Board," that Alan Howe was appointed as "chairman" of the Audit Committee, and that the Nominating and Governance Committee was composed of "Mark Holliday, Alan Howe and Skyler Wichers, with Mark Holliday appointed as the chairman of the committee."

178. The Form 6-K filed January 15, 2026 on behalf of Scully was signed by "Skyler Wichers" as "Chairman of the Board."

179. Through signing the January 15, 2026 Form 6-K on behalf of Scully, Wichers attested that "Pursuant to the requirements of the Securities and Exchange Act of

1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized."

180. On January 15, 2026 and January 16, 2026, Scully's CEO emailed Toppan Merrill about the two Forms 6-K filed without proper authorization.

181. On January 16, 2026, a Senior Vice President of Sales at Toppan Merrill responded to the CEO, acknowledging receipt and stating that "[w]e are in the process of gathering the details to better understand what transpired and will be in touch soon."

182. On January 17, 2026, the Senior Vice President at Toppan Merrill provided resources on removing the SEC filings to the Company's Executive Chairman and to the Company's outside counsel in Canada, which has served as lead counsel to the Company on its securities filings in both Canada and the United States for more than a decade ("Company's Canadian Counsel").

183. On January 20, 2026, the Senior Vice President stated to Scully's CEO that "We receive direction from companies' counsel for corporate filings and we rely on the professional responsibility of the attorneys and corporations involved." The Senior Vice President confirmed that the "[Company's Canadian Counsel] remains the administrator for Scully Royalty's" SEC filings.

184. On February 11, 2026, outside counsel for Milfam Nominees, including Wichers, emailed the "Toppan team" and asked: "Could you please EDGARize the attached 6-K, which we intend to file after market close today?"

185. On the same day, a Director for EDGAR Services responded to Milfam Nominees' counsel, stating: "Our ability to file 6-K's for Scully Royalty has been

suspended by the administrator currently designated as [the Company's Canadian Counsel]. Please coordinate a delegation from [the Company's Canadian Counsel] to us or yourselves so we can file this at your requested timeline."

186. On February 11, 2026, counsel for Milfam Nominees responded.

187. Counsel for Milfam Nominees stated: "[the Company's Canadian Counsel] is no longer counsel to the company and have no right to direct anyone on behalf of Scully."

188. The Senior Vice President for Sales, who had previously communicated with Scully's CEO, also responded to this message on February 11, 2026.

189. The Senior Vice President stated: "If [the Company's Canadian Counsel] is no longer counsel, they should provide you with admin rights you can ask them to transfer those rights, or provide us written authorization from [the Company's Canadian Counsel] in the meantime to facilitate timely filings."

190. Defendants' representative sent an email to the Company's Canadian Counsel on the same day, requesting transfer of the Company's EDGAR filing rights, indicating that, "If you fail to take action as suggested above, you will be the cause of whatever harm befalls the Company and will be held liable for such harm."

191. In the same email communication, Defendants' counsel stated to the Company's Canadian Counsel: "Your only options are as set forth above."

192. The Company's Canadian Counsel declined to transfer the EDGAR filing credentials to Milfam Nominees' outside counsel in an email dated February 15, 2026.

193. On March 18, 2026, Howe filed a Form 3 indicating his status as a "Director" at Scully. Form 3 is a document that company officers and directors of publicly traded companies must file with the SEC within 10 days of becoming an officer or director.

194. On March 26, 2026, Jerrod Freund filed a Form 3 indicating his status as a "Director" at Scully.

195. On July 8, 2026, Howe filed an amendment to his Form 3 stating that his prior March 18, 2026 filing was "in error." Howe stated, "The Reporting Person is not a director of the Issuer," and given the Judgment issued by "the Grand Court of the Cayman Islands," "there was a failure to appoint any directors, including the Reporting Person, and the incumbent directors remain in office until either their successors are elected or they otherwise cease to hold office."

196. On July 8, 2026, Freund filed an amendment to his Form 3 stating that his prior March 26, 2026 filing was "in error." Freund stated, "The Reporting Person is not a director of the Issuer," and given the Judgment issued by "the Grand Court of the Cayman Islands," "there was a failure to appoint any directors, including the Reporting Person, and the incumbent directors remain in office until either their successors are elected or they otherwise cease to hold office."

197. The Company suffered reputational harm connected with the usurpation of its filing rights, loss of stockholder confidence, and reputational damage sustained to Company directors and officers by the two publications.

### L. Defendants Milfam, Wichers, Subin, Howe, and Holliday Work Together to Interfere with the Company's Business Relationship with Toppan Merrill to File Unauthorized SEC Filings on Behalf of Scully

198. On information and belief, Wichers and Subin directed Milfam's counsel to engage in direct communications with Toppan Merrill for purposes of filing Forms 6-K without incumbent management approval in January 2026.

199. On information and belief, Wichers and Subin authorized Milfam counsel's direct communications with Toppan Merrill for purposes of seeking to file additional Forms 6-Ks in February 2026 on behalf of Scully.

200. On information and belief, Howe and Holliday authorized the conduct of Milfam's outside counsel to pressure Toppan Merrill into filing SEC forms on behalf of Scully.

201. On information and belief, Howe and Holliday, as purported directors of the "new board," approved of the Forms 6-K issued January 14, 2026 and January 15, 2026 before they were filed. The two Forms 6-K disclosed the purported termination of the Company's CEO and the selection of Howe as chairman of the Audit Committee and Holliday as chairman of the Nominating and Governance Committee.

202. On information and belief, Howe and Holliday, as purported directors of the "new board," approved the Forms 6-K issued January 14, 2026 and January 15, 2026 because the contents of those filings directly related to Howe and Holliday, and relate to the "committees" of the "new board" they claimed to have served on.

203. On information and belief, Howe and Holliday, as members of the Milfam Nominees to the Scully Board, knew that the Company had not authorized Toppan Merrill to file the Forms 6-K issued on January 14, 2026 and January 15, 2026.

204. On information and belief, Howe and Holliday knew that the issue of whether they were validly elected to the Board of Scully was directly pending in the Second Cayman Proceedings, which Milfam had initiated.

205. Subin, serving as President at Milfam, signed the Schedule 13D filings for Milfam from November 2025 to December 2025.

206. On information and belief, Subin has familiarity with Schedule 13D and has read the attestation that accompanies each signature on Schedule 13D as required before filing.

207. On information and belief, Subin as President at Milfam was involved in formulating and/or directing Milfam's activist position in Scully, as announced in Milfam's Schedule 13D filed November 26, 2025.

208. On information and belief, Subin selected Wichers, who serves as a portfolio manager of Milfam, to be one of Milfam's Nominees to the slate of board candidates running against the incumbent management of Scully.

209. On information and belief, Subin and Wichers discussed, and Wichers agreed to serve as purported "Chairman of the Board" of Scully, in part because Subin sought to advance Milfam's goals in Scully based on Milfam's investment position in the Company and because Wichers is the sole, full-time employee of Milfam amongst the Milfam Nominees.

210. On information and belief, Subin and Wichers, with positions of leadership at Milfam, agreed to have Milfam's counsel communicate with Toppan Merrill on or before January 14, 2026, in connection with the Form 6-K filed January 14, 2026 that furnished a press release Milfam had issued on Globe Newswire announcing the purported termination of Scully's CEO.

211. Wichers signed the Form 6-K, filed on behalf of Scully on January 14, 2026, as "Chairman of the Board."

212. On information and belief, Milfam's counsel represented itself to Toppan Merrill as counsel to the validly elected new board of Scully in its January 2026 communications with Toppan Merrill.

213. Toppan Merrill stated in an email to Scully's incumbent management dated January 20, 2026 that it relied "on the professional responsibility of the attorneys and corporations involved," in reference to Toppan Merrill's reliance on Milfam counsel's representations in connection with the Forms 6-K filed on January 14 and January 15, 2026 on Scully's behalf.

214. On information and belief, Milfam counsel's attempt to have an additional Form 6-K filed on February 11, 2026 through Toppan Merrill—"which we [Milfam's counsel] intend to file after market close today" as disclosed in their email communications to Toppan Merrill—was undertaken on behalf of Wichers (both as a Milfam portfolio manager and a Milfam Nominee), Subin, and Milfam Nominees Howe and Holliday.

### M. Defendants Milfam, Wichers, Subin, Howe, and Holliday Work Together to Interfere with the Company's Contract with Its CEO

215. Scully had a contract with its CEO during the November 2025 – March 2026 period. The contract was entered into with Scully's CEO on October 1, 2025, and it governed the CEO's compensation and terms of employment.

216. On or before January 14, 2026, Milfam and its nominees caused to be filed a Form 6-K on behalf of Scully, dated January 14, 2026, the filing of which was directed by Milfam's counsel through communications with Toppan Merrill.

217. The Form 6-K dated January 14, 2026 states: "On January 12, 2026, MILFAM LLC issued a press release titled "Scully Royalty Ltd. Board of Directors Terminates CEO and Commences Search for New CEO," a copy of which is furnished herewith as Exhibit 99.1 and incorporated by reference herein."

218. The Form 6-K dated January 14, 2026 is signed by Wichers as "Chairman of the Board."

219. The press release furnished as Exhibit No. 99.1 to the Form 6-K dated January 14, 2026 stated: "MILFAM LLC ("MILFAM") announced today that the recently elected board of directors of Scully Royalty Ltd. (the "Company") (NYSE:SRL) has terminated for cause CEO, CFO, and President Samuel Morrow and rescinded all authority held by Mr. Morrow with respect to the Company and its subsidiaries. Any action taken by Mr. Morrow or at his direction from this point forward is invalid. The board of directors will be assuming day to day operations of the Company while it searches for new officers."

220. The same press release also stated: "Upon election, the New Board immediately took steps to exercise control of the Company and begin working with Mr. Morrow. However, the Former Board, including Mr. Morrow, have refused to acknowledge or take direction from the New Board. Mr. Morrow, in his executive capacity, was given multiple opportunities to engage with the New Board in good faith. Instead, he refused to timely comply with even the New Board's most basic requests and has instead continued to advance the Former Board's agenda to obstruct the will of the majority of the shareholders."

221. On information and belief, the purported "new board," including Milfam Nominees Wichers, Howe, and Holliday, held a "vote" on terminating Morrow as CEO, and each of Wichers, Howe, and Holliday "voted" in favor of Morrow's termination.

222. On information and belief, Holliday, as the purported chairman of the "new board's" Nominating and Governance Committee, approved of the decision to terminate the Company's CEO.

223. On information and belief, the purported "new board," including Milfam Nominees Wichers, Howe, and/or Holliday, directed third parties with business relationships with Scully to stop communicating with or taking directions from Morrow as Scully's CEO in light of the Form 6-K published on behalf of the Company on January 14, 2026.

224. On March 20, 2026, a complaint captioned "*Scully Royalty Ltd. v. Samuel Steffey Morrow*" was filed in the District of Massachusetts, Case No. 1:26-cv-11373-RGS (the "District of Massachusetts Proceedings").

225. The District of Massachusetts Proceedings were purportedly initiated by the Company.

226. On information and belief, Milfam's outside counsel directed a Massachusetts law firm to file the District of Massachusetts Proceedings.

227. Morrow was the CEO of Scully during the time period when the District of Massachusetts Proceedings were pending.

228. The complaint in the District of Massachusetts Proceedings raised multiple claims against Morrow on the basis of his allegedly unauthorized access of computers after his purported "termination," and raised multiple claims against Morrow under the Computer Fraud and Abuse Act, the Stored Communications Act, and federal and state trade secrets acts, among others.

229. Neither Scully, its incumbent management, or its validly-elected Board of Directors directed or authorized the Massachusetts law firm to initiate the District of Massachusetts Proceedings.

230. Scully's CEO filed a motion to dismiss and accompanying memorandum in support on June 11, 2026 in the District of Massachusetts Proceedings.

231. The Company's contract with its CEO and its Articles of Association, dated July 12, 2017, provide for indemnification of officers and directors in connection with litigation related to their positions within the Company.

232. The Massachusetts law firm filed a notice of voluntary dismissal, "by Scully Royalty," on June 25, 2026.

233. After the District of Massachusetts Proceeding was dismissed, the Company contacted the Massachusetts law firm and requested information about the supposed representation of Scully.

234. In August 2026, the Massachusetts law firm stated: "Although I believed in good faith that I represented Scully Royalty, Ltd. ("Scully"), the Cayman Islands court has ruled that the people who engaged me to represent Scully lacked the authority to do so."

235. Also in August 2026, the Massachusetts law firm stated: "Given the court's Decision that the people who engaged me were not validly elected directors, they lacked authority act [sic] on Scully's behalf - - including engaging me to represent Scully."

236. The Massachusetts law firm continued: "Given the Decision and the case law that I found, I must conclude that my representation of Scully was a nullity, and my actual clients were the shareholders (comprising the invalidly elected board of directors) who hired me."

237. Scully expended resources in indemnifying its CEO for all costs incurred in and associated with defending the District of Massachusetts proceedings.

238. Scully faced significant reputational harm due to the Milfam Nominees' conduct in filing federal court litigation on its behalf without authorization, against its CEO.

### N. Defendants Milfam, Wichers, Subin, Howe, and Holliday Work Together in an Attempt to "Terminate" Scully's Contract with its CEO

239. The decision to purportedly "terminate" Scully's CEO was announced in a Form 6-K Wichers signed, supposedly on behalf of Scully, dated January 14, 2026.

240. The "termination" decision was made, as explained in the press release furnished with the Form 6-K filed January 14, 2026, by the "recently elected board of directors" as it operated together.

241. The Milfam Nominees described the CEO's termination as "for cause."

242. The Milfam Nominees announced in the same press release furnished as an exhibit to the Form 6-K, that: "Any action taken by Mr. Morrow or at his direction from this point forward is invalid. The board of directors will be assuming day to day operations of the Company while it searches for new officers."

243. The decision to attempt to terminate the contract between Scully and its CEO was made not by one Milfam Nominee, but by the Milfam Nominees acting in concert as indicated in the aforementioned press release.

244. On information and belief, each of Wichers, Howe, and Holliday "voted" in favor of terminating Morrow as CEO of Scully.

245. On information and belief, the purported "new board," including Milfam Nominees Wichers, Howe, and/or Holliday, directed third parties with business relationships with Scully to stop communicating with or taking directions from Morrow as Scully's CEO in light of the Form 6-K published on behalf of the Company on January 14, 2026.

246. The termination decision that purportedly took place on January 12, 2026, and the initiation of the District of Massachusetts Proceedings on March 20, 2026, occurred after Milfam filed its originating summons in the Second Cayman Proceedings on January 5, 2026.

247. Milfam initiated the Second Cayman Proceedings for declaratory relief on the issue of whether the Milfam Nominees constituted the valid board of Scully, among other issues.

248. Milfam and its Nominees, Wichers, Howe, and Holliday, knew or should have known that the constitution of the valid board of Scully was subject to legal proceedings initiated by Milfam on January 5, 2026.

249. On information and belief, Subin as President of Milfam was involved in the decision to initiate the Second Cayman Proceedings, in part because "Milfam LLC" was the party that initiated the Second Cayman Proceedings.

250. On information and belief, Subin was involved in the decision to attempt to terminate the Company's contract with its CEO.

251. On information and belief, Holliday, as the purported chairman of the "new board's" Nominating and Governance Committee, approved of the decision to terminate the Company's CEO.

252. On information and belief, the idea of seeking to terminate the Company's contract with its CEO originated with Wichers and/or Subin on or before January 14, 2026.

253. On January 4, 2026, Wichers emailed the Company's CEO requesting release of the Company's non-public information to the Milfam Nominees. Wichers stated in the email: "failure to comply with this request today will force us to proceed with your termination for cause."

254. On January 5, 2026, the Company's CEO responded and requested clarity on the terms of a confidentiality agreement, including asking Wichers whether others in the Milfam group, including Subin, would be able to access the Company's non-public information.

255. On January 5, 2026, Wichers responded by stating: "Your continued refusal to acknowledge or take direction from this board is noted."

256. On January 8, 2026, Wichers emailed the CEO, stating: "You continue to disregard the instructions of the legitimate Board of Directors."

257. On information and belief, Wichers and/or Subin directed that the District of Massachusetts Proceedings be initiated against CEO Morrow.

## **FIRST CLAIM FOR RELIEF**

### **Violation of Section 13(d) of the Exchange Act (15 U.S.C. § 78m(d)) and Regulation 13D-G (17 C.F.R. § 240.13d-1, 17 C.F.R. § 240.13d-2, 17 C.F.R. § 240.13d-5, 17 C.F.R. § 240.13d-101) – Schedule 13D Filings (Against All Defendants)**

258. Plaintiff repeats and realleges the above allegations in Paragraphs 1 to 128 as if fully set forth herein.

259. Section 13(d) of the Exchange Act requires that investors acting as a group for the purpose of acquiring, holding, or voting the stock of an issuer must disclose the

group's existence and make plain their intentions once group members collectively acquire the beneficial ownership of 5% or more of the issuer's stock. 15 U.S.C. § 78m.

260. Rule 13d-2(a) provides that any material change to the facts set forth in a statement on Schedule 13D must be disclosed in an amendment to the Schedule 13D within two business days after the date of such change. 17 C.F.R. § 240.13d-2.

261. Rule 13d-5(b) provides that when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of the issuer's stock, the group shall be deemed to have acquired beneficial ownership for purposes of Section 13(d) of the Exchange Act. 17 C.F.R. § 240.13d-5.

262. Here, Defendants formed a "group" for purposes of Section 13(d). As explained above, there is evidence that representatives of Kellogg and Milfam met, discussed, and coordinated regarding the vote on Scully's Board of Directors before the vote occurred, and then continued to act together, as a group, regarding the governance of Scully after the vote.

263. As set forth above, Milfam's and Kellogg's Schedule 13D and amendments thereto fail to make the full and fair disclosure required by the Exchange Act and the rules promulgated thereunder, including, but not limited to, by failing to disclose that Milfam, Kellogg, and the remaining Defendants had agreed to act together for purposes of voting the Company's stock in connection with the 2025 Proxy Contest.

264. In the alternative, even if Defendants Milfam and Kellogg did not form a "group" within the meaning of Section 13(d), by reason of the foregoing, each was

required to file updated and accurate Schedule 13D disclosures. Failing to do so operates as a separate and independent violation of Section 13(d).

265. By reason of the foregoing, Defendants violated Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, including Rules 13d-1, 13d-2, 13d-5, and 13d-101.

266. Because of the material omissions in Milfam's and Kellogg's Schedules 13D and all amendments thereto, Scully and its shareholders are threatened with irreparable harm, including a repeat contest with the same group at the forthcoming 2026 Annual Meeting. There is no adequate remedy at law for such irreparable harm. Therefore, injunctive relief is appropriate to ensure the Defendants' misconduct is corrected.

## SECOND CLAIM FOR RELIEF

### Tortious Interference with Business Relationship – Florida Common Law (Against Defendants Milfam LLC, Skyler Wichers, Neil Subin, and Alan Howe)

267. Plaintiff repeats and realleges the above allegations in Paragraphs 1 to 79 and 120 to 164 as if fully set forth herein.

268. Defendants engaged in tortious interference with a business relationship when they improperly communicated with AOGB in connection with the Company's audit for the year ending December 31, 2025.

269. Defendants Milfam LLC, Wichers, Subin and Howe are not parties to this business relationship. They are strangers to the Company's business relationship with AOGB.

270. Defendants sought the Company's confidential and non-public information from AOGB.

271. Defendants knew that AOGB was the Company's auditing firm because they consistently sought the Company's confidential and non-public information from AOGB. AOGB stated on multiple occasions that it was unable to disclose the Company's information to third parties.

272. Defendants placed significant pressure on AOGB beginning in January 2026 to provide the Company's confidential information to Defendants, to facilitate communications, and to prepare presentations, while purporting to act for a "new board" notwithstanding the pendency of legal proceedings on the validity of Defendants' election, which Defendants themselves had initiated.

273. Defendants' conduct caused harm. AOGB terminated its business relationship with the Company. The Company was unable to comply with pending regulatory deadlines, and the NYSE placed a freeze on trading in the Company's shares, depriving the Company of growth it would have enjoyed but for the interference, requiring the Company to spend more to find an adequate replacement with deadlines pending, and diminishing the Company's reputation amongst shareholders.

## THIRD CLAIM FOR RELIEF

**Tortious Interference with Business Relationship – Florida Common Law (Against Defendants Milfam LLC, Skyler Wichers, and Neil Subin)**

274. Plaintiff repeats and realleges the above allegations in Paragraphs 1 to 79, 120 to 128, and 165 to 214 as if fully set forth herein.

275. Defendants engaged in tortious interference with a business relationship when they improperly placed pressure on the Company's years-long business relationship with Toppan Merrill.

276. Defendants Milfam LLC, Wichers, and Subin are not parties to this relationship. They are strangers to the Company's business relationship with Toppan Merrill.

277. Defendants, including through their counsel, sought to have Toppan Merrill publicly file Defendants' documents in the Company's name, even after being told by Toppan Merrill that authorization would have to come from the Company's Canadian Counsel, given that the Company's Canadian Counsel was the only law firm with delegated authority to authorize filings with the SEC on the Company's behalf.

278. Defendants knew that Toppan Merrill was the Company's third party filing agent that publicly filed documents, including forms required by the SEC, on the Company's behalf, because Toppan Merrill employees told Defendants and their representatives on multiple occasions to seek authorization from the Company and Company's Canadian Counsel before Toppan Merrill could publicly file documents under the Company's name.

279. Defendants placed significant pressure on Toppan Merrill over a period of time beginning in January 2026 to make disclosures, to file Defendants' documents, and to comply with Defendants' timeline for filing, while purporting to act for a "new board" notwithstanding the pendency of legal proceedings on the validity of Defendants' election, which Defendants themselves had initiated.

280. Defendants Wichers and Subin, through shared counsel, misrepresented themselves to Toppan Merrill either knowingly, or with a reckless disregard for the truth in light of the then-pending Second Cayman Proceedings that Milfam had initiated.

281. The misrepresentation was not justifiable.

282. Defendants' conduct caused harm. Two Forms 6-K were filed on behalf of the Company by persons who were not authorized by the Company to do so. Defendants had no reason to believe they had authority when Company counsel expressly denied their request for filing rights. The Company suffered reputational harm connected with the usurpation of its filing rights, loss of stockholder confidence, and reputational damage sustained to Company directors and officers by the two publications.

## FOURTH CLAIM FOR RELIEF

**Tortious Interference with Contract – Florida Common Law (Against Defendants Milfam LLC, Skyler Wichers, Neil Subin, Alan Howe, and Mark Holliday)**

283. Plaintiff repeats and realleges the above allegations in Paragraphs 1 to 79, 120 to 128, and 215 to 257 as if fully set forth herein.

284. Defendants engaged in tortious interference with a contract when they improperly interfered with the Company's contract with its CEO.

285. Defendants Milfam LLC, Wichers, Subin, Howe, and Holliday are not parties to this contract. They are strangers to the Company's contract with its CEO.

286. Defendants knew that the Company had a contract or business relationship with its CEO as part of his employment with the Company.

287. Defendants caused to be issued a Form 6-K filed January 14, 2026 on Scully's EDGAR account, which was furnished with a press release announcing to public shareholders that the Company's CEO had been terminated for cause.

288. On information and belief, Defendants again acted on behalf of the Company without valid authorization and directed that proceedings against the Company's CEO be initiated in the District of Massachusetts in March 2026, raising claims against the CEO premised upon his alleged termination.

289. Defendants' conduct caused harm: the Company was required to indemnify and reimburse its CEO for costs and expenses associated with the District of Massachusetts Proceedings initiated and directed by the Milfam and Defendants Wichers, Subin, Howe, and Holliday. Defendants' conduct also caused reputational harm to the Company based on the publicly disclosed conduct that it had purportedly taken against its CEO, as published in the Milfam Globe Newswire press release and on the Company's EDGAR page as furnished in a Form 6-K dated January 14, 2026 (which was filed through Defendants' interference with the Company's SEC filer), incorporating the Milfam press release.

## FIFTH CLAIM FOR RELIEF

### Civil Conspiracy Involving Tortious Interference with Business Relationship – Florida Common Law (Against Defendants Milfam LLC, Skyler Wichers, Neil Subin, and Alan Howe)

290. Plaintiff repeats and realleges the above allegations in Paragraphs 1 to 79, 120 to 164, and 267 to 273 as if fully set forth herein.

291. Each of Milfam and Defendants Wichers, Subin, and Howe entered into an agreement with one another to interfere with the Company's business relationship with AOGB.

292. Defendants Wichers, Howe, and Subin induced or otherwise caused AOGB to resign as auditor, terminating its relationship with the Company.

293. Defendants Wichers, Howe, and Subin acted knowing that their actions were likely to result in AOGB's termination or withdrawal as the Company's auditor.

294. Defendants Wichers and Howe misrepresented themselves to AOGB either knowingly, or with a reckless disregard for the truth in light of the then-pending Second Cayman Proceedings Milfam had initiated.

295. The misrepresentation was not justifiable.

296. The Defendants' conduct was the cause of damage and loss to Plaintiff, including but not limited to the harms sustained by the Company as stated in Paragraphs 146, 147, and 273.

297. Because the Defendants coordinated their tortious interference with the Company's business relationship with AOGB, they are liable for civil conspiracy to tortiously interfere with a business relationship.

## SIXTH CLAIM FOR RELIEF

**Civil Conspiracy Involving Tortious Interference with Business Relationship – Florida Common Law**
**(Against Defendants Milfam LLC, Skyler Wichers, Neil Subin, Alan Howe, and Mark Holliday)**

298. Plaintiff repeats and realleges the above allegations in Paragraphs 1 to 79, 120 to 128, 165 to 214, and 274 to 282 as if fully set forth herein.

299. Each of Milfam and Defendants Wichers, Subin, Howe, and Holliday entered into an agreement with one another to interfere with the Company's business relationship with Toppan Merrill.

300. Defendants Wichers and Subin directed, induced, or otherwise caused Toppan Merrill to issue the two Forms 6-K filed January 14, 2026 and January 15, 2026 on purported behalf of the Company.

301. On information and belief, Defendants Wichers and Subin, through directions to Milfam's outside counsel, acted with the knowledge that they did not have authorization to direct filings on Scully's behalf but did so anyway, or acted with reckless disregard to whether they were so authorized.

302. Defendants Wichers, Howe, and Holliday on information and belief authorized the conduct of Milfam's outside counsel to pressure Toppan Merrill into filing SEC forms on behalf of Scully.

303. Defendants Wichers, Subin, Howe, and Holliday on information and belief directed Milfam's outside counsel to misrepresent their authority to Toppan Merrill either knowingly, or with a reckless disregard for the truth in light of the then-pending Second Cayman Proceedings that Milfam had initiated.

304. The misrepresentation was not justifiable.

305. The Defendants' conduct was the cause of damage and loss to Plaintiff, including but not limited to the harms sustained by the Company as stated in Paragraphs 197 and 282.

306. Because the Defendants coordinated their tortious interference with the Company's business relationship with Toppan Merrill, they are liable for civil conspiracy to tortiously interfere with a business relationship.

## <u>SEVENTH CLAIM FOR RELIEF</u>

**Civil Conspiracy Involving Tortious Interference with Contract – Florida Common Law**
**(Against Defendants Milfam LLC, Skyler Wichers, Neil Subin, Alan Howe, and Mark Holliday)**

307. Plaintiff repeats and realleges the above allegations in Paragraphs 1 to 79, 120 to 128, 215 to 257, and 283 to 289 as if fully set forth herein.

308. Each of Milfam and Defendants Wichers, Subin, Howe, and Holliday entered into an agreement with one another to interfere with the Company's contract with its CEO, including by taking steps to terminate the Company's contract with CEO Morrow.

309. Defendants Wichers and Subin on information and belief directed, induced, or otherwise caused the Massachusetts law firm to file a complaint against the Company's CEO, on behalf of the Company, in the District of Massachusetts.

310. Defendants Wichers and Subin knew they did not have authorization to direct filings on Scully's behalf but did so anyway, or acted with reckless disregard to whether they properly had authorization to file the Forms 6-K at the time of filing.

311. Defendants Wichers and Subin on information and belief misrepresented themselves to the Massachusetts law firm either knowingly, or with a reckless disregard for the truth in light of the then-pending Second Cayman Proceedings Milfam had

initiated, as duly authorized individuals for purposes of bringing suit on behalf of the Company.

312. The misrepresentation was not justifiable and constitutes an improper act.

313. The Defendants' decision to direct that a lawsuit be filed against the Company's CEO for breaches associated with his purported "termination" is also not justifiable.

314. The Defendants' conduct was the cause of damage and loss to Plaintiff, who had to pay all indemnification-related expenses and reimbursements to its CEO after the fact, including but not limited to the additional harms sustained by the Company as stated in Paragraphs 237, 238, and 289.

315. Because the Defendants coordinated their tortious interference with the Company's contract with its CEO, they are liable for civil conspiracy to tortiously interfere with a contract.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief:

a. Declaring that Defendants have violated Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, including Rule 13d-1, 13d-2, 13d-5 and 13d-101;

b. Issuing an injunction ordering Defendants to furnish accurate disclosures under Section 13(d) of the Exchange Act as required by law on Schedule 13D before Defendants can vote their shares at the

Company's next shareholder meeting as scheduled and duly convened by the Company's validly elected Board of Directors;

c. Awarding Plaintiff its costs and fees in this action, including its reasonable fees for effectuating compliance with Section 13(d) of the Exchange Act;

d. Awarding Plaintiff damages associated with Defendants' tortious interference with contracts and business relationships and Defendants' civil conspiracies involving the same, including but not limited to: costs the Company expended in indemnifying its CEO for the District of Massachusetts Proceedings initiated by Defendants; monetary or pecuniary loss of the benefit of its business relationship with AOGB; consequential losses suffered by the Company for which the interferences served as proximate cause; damages reasonably flowing from each of the Defendants' interferences with the Company's existing contracts and business relationships; and actual harm to Company's reputation from Defendants' interferences; and

e. Granting Plaintiff such other relief as this Court may deem just and proper.

Dated: September 1, 2026

Respectfully submitted,

*/s/ Martin B. Goldberg*

Martin B. Goldberg
Florida Bar No. 827029
mgoldberg@lashgoldberg.com
Benjamin R. Shiekman
Florida Bar No. 113114
bshiekman@lashgoldberg.com
LASH GOLDBERG FINEBERG LLP
Miami Tower
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131-2158
Telephone: (305) 347-4040
Facsimile: (305) 347-4050

LATHAM & WATKINS LLP
Colleen C. Smith (*admitted pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130-3086
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
Colleen.Smith@lw.com

John J. Barber (*admitted pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Jack.Barber@lw.com

Jordan Davisson Cook (*admitted pro hac vice*)
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626-1925
Telephone: (714) 755-8238
Facsimile: (714) 755-8290
Jordan.Cook@lw.com

*Attorneys for Plaintiff Scully Royalty Ltd.*